# Richmond

## G. L. WEBSTER COMPANY, INC. V. EMORY J. STEELMAN.

February 20, 1939.

Record No. 2002.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Spratley, JJ.

The opinion states the case.

*Otto Lowe, Mears & Mears, J. Brooks Mapp* and *William King Mapp,* for the plaintiff in error.

*James E. Heath, Thomas H. Nottingham* and *Quinton G. Nottingham,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action instituted in December, 1937, by Emory J. Steelman against the G. L. Webster Company, Inc., to recover damages to seafood, both above and below low-water mark in tidal waters, by reason of pollution of said waters, and damages to the enjoyment and use of high land, situated on these waters, by reason of noxious odors, stench, and filth created by this pollution.

There was a verdict and judgment in favor of the plaintiff solely for damage to his real property by the odors, to which the defendant obtained a writ of error. There are no assignments of cross-error.

The parties hereto will be designated as plaintiff and defendant, in accordance with the respective positions they occupied in the trial court.

Although many questions of law and fact were raised in the trial court, the issues have been greatly narrowed here because of the absence of assignments of cross-error. The trial occupied six days, and the evidence fills 450 printed pages. Much of this evidence relates to questions with which we are not now concerned. A statement of so much as is essential to a clear understanding of the most important and pertinent facts is, in itself, fairly extensive.

Accordingly, confining ourselves to that portion of the evidence which has a bearing on the issues before us, a fair statement from the record discloses the following case:

The defendant, in 1920, obtained a charter in Virginia to establish and operate in this State a canning factory. It purchased that year a tract of land at Cheriton, Virginia, a small unincorporated community of about 700 persons. This village is located in a wholly agricultural community. It is in a flat terrain, located between Chesapeake bay and the Atlantic ocean, on the lower tip of the peninsula, consisting of the counties of Northampton and Accomac. The land of the plaintiff is no higher than that of the surrounding land, and does not lie in any natural watershed. It has to be drained entirely by artificial means, by ditches running to small drains and branches leading to one of the many creeks entering into a larger creek or bay.

The plant of the defendant was built on the eastern side of the right-of-way of the Pennsylvania Railroad Company, which runs approximately through the center of the county.

It is necessary for a plant of this character to have an ample supply of water for cleansing and canning purposes, and also an outlet for its refuse water and waste material. Here the defendant, in the absence of sufficient water from natural sources, had to drill wells for its supply. It also had to provide for its drainage.

In 1920, when the canning company purchased its land, there was a small, open ditch on its western side, running along the eastern side of the right-of-way of the railroad company, northwardly, for 1,400 feet. It then passed at

right angles under the railroad right-of-way, and continued in a more or less westerly direction to the head of what is known as Hanby's branch, an enlarged drain, and through this branch to the waters of Eyre Hall Creek. The branch widens as it progresses westwardly, the course of the water passing in a channel approximately in the center of the branch. As Eyre Hall Creek, upon which is located the real property of the plaintiff, is reached, there are marshes, shoals, and flats widening out to a considerable extent. From the mouth of Eyre Hall Creek it is approximately one mile to the navigable part thereof, which makes the navigable channel begin within a short distance of the property of the plaintiff.

The distance from the canning plant to the property of the plaintiff, hereinafter mentioned, is 2.69 miles. The shore line of Northampton county, both on the ocean and bay side, is indented by numerous creeks, which have branches extending almost to the center of the county. From the plant at Cheriton, it was easier and shorter to direct the drain to the Chesapeake bay site than to the ocean side, the plant being nearer to Hanby's branch, or the ditch leading thereto, than to any other drainage ditch.

A number of other branches and arms of branches, or small creeks, drain into Eyre Hall Creek. Eyre Hall Creek itself empties into Cherrystone Creek, which, in turn, empties into the open waters of Chesapeake bay.

The defendant's operations began in a small way in 1920, and successively increased until in 1930, and subsequent thereto, it had become one of the largest, if not the largest, canning plant in the United States. It put up 18,000 cases of canned beans in 1920; 135,000 cases in 1921, and reached a peak of approximately 1,000,000 cases of peas, beans, other vegetables and vegetable juices in 1930. Since 1930, the output has been approximately the same. Naturally the enlargement in the size of the plant and the scope of its operations were commensurate with the increase of its output. From the small tract of land and small plant with which it began in 1920, it has expanded until it now owns,

for its operating purposes, at Cheriton, 60 acres of real estate, on which the buildings alone cover approximately 20 acres of floor space. It owns two or three farms in the county, and leases and operates 60 more, the 60 farms containing over 6,000 acres of cleared land used in the cultivation of vegetables for canning purposes. In addition, it buys a large amount of vegetables from other farmers throughout the county. The approximate net weight of the vegetables annually canned since 1930, exclusive of vines and hulls, has been about 10,000 tons, the equivalent of 166 freight car loads of about 60 tons each.

The first canned product was lima beans, but to this have been added peas, carrots, some pork and beans, a few beets, snap beans, sweet potatoes, spinach, tomato soup and tomato juice. The manufacture of tomato soup was abandoned in 1936, and the canning of tomato juice was taken on in its stead. The largest product of the plant is canned tomato juice, which amounted to 500,000 cases in 1936, about half of the total output of the plant.

The season for canning the various crops is naturally dependent upon the ripening of the vegetables. The plant opens with the canning of spinach in April, peas in May, tomato juice about July 10th, and beets about the same time. The operation is then continuous until the last of October or the middle of November. During the months between November and April, little canning is done, that time being given to the preparation for next year's crops and operation.

The employees of the plant in 1920 were few; but the number gradually increased up to the year 1930, since which time the average number of year-round employees has been from four to five hundred, and during the busy packing seasons, from one thousand to one thousand, two hundred. The plant expended on pay rolls, rents and farm produce, during the year 1937, a sum in excess of $461,000. These detailed figures are given to show the growth, extent and size of its operations.

In preparation for the canning process, the vegetables must first be dusted and cleaned. The vines or pods are

separated from the vegetables. After the larger particles of dust are removed, a heavy blast of air is cast upon the vegetables to take off all chaff or like material. They are then sprayed and washed with water. The used water passes through a series of screens designed to further remove therefrom all particles of solid matter, the size of tomato seeds or larger, before it makes its final passage through the drainage ditch into Hanby's branch and to Eyre Hall Creek. A standard type of screening approved by the industry is provided. The water used is drawn by pumps from wells 300 feet deep in the earth. The amount used varies according to the operation of the plant. About 500 gallons per minute are used during the peak of the canning season. All of this water is added to the ordinary and natural flow of the ditch and branches leading to the creek. Such foreign matter as is caught by the screens is removed and carried off to be used for other purposes. No human sewage goes into the drains.

Notwithstanding the efforts to keep solid vegetable matter from entering the ditches and drains, it is apparent that a certain amount passes into them, together with a sediment of organic material, or "suspended matter" from the vegetables. This sediment or "suspended matter," upon being released from the water, settles on the sides and bottom of the ditches and drains. By reason of this, and other causes creating obstructions in the drains, the defendant found it necessary to clean them out at least once, and sometimes twice annually, a work requiring several weeks time. To secure a free and uninterrupted flow in a more direct course, the ditches and drains were, from time to time, altered. Curves and angles were reduced, or cut off, and the channels straightened and deepened. The ditches and drains are shallow as a rule, but their depths vary, and at places in the channel deep holes may be found. For the larger part of their courses they are narrow, being only two or three feet wide, with the width enlarging as they proceed toward Eyre Hall Creek.

The plaintiff, E. J. Steelman, on April 26, 1933, purchased his home, the land in question, a tract containing 40.97 acres, with the riparian rights appertaining, situated on Eyre Hall Creek, a fork or prong of Cherrystone Creek. He paid $4,050 for the property, and expended $5,000 in improvements thereon. Prior to his purchase he had lived on adjoining property on this same creek, where he had been engaged in the seafood business. He had often gone upon the land here involved and was familiar with the entire surroundings. It was an attractive homeplace on the water, and convenient to his business of growing and marketing seafood. He testified that the air, the waters, and general conditions surrounding this property were ideal for living purposes and for his business until the summer of 1936.

In the summer of 1936, according to a number of witnesses, the waters in the upper part of Eyre Hall Creek became heavily laden with silt, slur, slime and vegetable matter. There were found thereon bean hulls, pea hulls, bean skins, tomatoes and peelings from vegetables. The water became black and reddish at times. There was a black and gray foam thereon. It was so thick and heavy with a foreign deposit that paint upon boats became discolored, and a substance like oil or tar stuck to any part of the body submerged therein. A most offensive odor arose therefrom. The condition existed mainly at ebb tide, low-water, and the first of flood tide. As the tide ebbed off the shore, it left on the low-grounds of the plaintiff, between high and low-water marks, the above described silt, slime and decaying vegetable matter. One witness described the odor as a vapor rising up from the flats, which spread over the land even if no wind was blowing. The wife of the plaintiff testified that the odor was so bad that, "You can't eat your food, can't sleep for the stink, and shut your windows to keep the stink out, and the heat is so bad." The odors were so offensive that the plaintiff was compelled to keep the windows and doors of his home closed even in the hottest weather, so that he could not continue to live there with

any degree of comfort, or engage in his work on the shore, or bathe in the waters of his beach. The record does not disclose that there was any complaint of offensive odors on these particular premises of the plaintiff before 1936.

Numerous witnesses testified that the fish, terrapin, crabs, oysters, and clams were destroyed, or rendered useless, by the pollution in the waters. A biologist of the Federal Bureau of Fisheries made certain tests of the waters, and testified that as a result of those tests he believed the waste and refuse from the vegetable matter cast into the waters was the cause of the destruction of the fish, oysters, and seafood. Other witnesses were in doubt as to whether the destruction was caused in part, or in whole, by the pollution. They were unable to assign any specific cause, other than a supposition that the heat of summer, or some unexplainable action of nature might have been a factor.

Prior to 1936, the odor from the vegetable matter that was deposited in Hanby's branch was noticeable and annoying to some of those who lived along that portion of the branch a mile or more from the plaintiff's home. In 1936, the ditch running into Hanby's branch was thoroughly cleaned out by the defendant, and the flow of the water containing the waste vegetable matter was made freer and quicker in running into Eyre Hall Creek. This improved ditch was cut through to the branch after a complaint of the odor had been made by a resident who lived along its course. As a result of the improvement in the branch, the waste and refuse vegetable matter, which had formerly settled in it seems to have been washed out in larger quantities into Eyre Hall Creek, and there settled and decomposed on the flats, shallows, and shores of the plaintiff. Afterwards, the offensive odors seem to have ceased along Hanby's branch.

There is ample evidence to show that the deposits from the waste and refuse discharged into the ditches and drains caused offensive odors. The president of the defendant corporation testified that the cause of the odor in Hanby's branch was the settlement of the organic matter from the

juices of the vegetables that were washed. It came through the washing process as "suspended" material, being released and deposited in the drains as the water progressed to its final destination. He denies that any substantial, solid matter entered the drains from his plant.

It is stated and claimed in the brief of the defendant that from 1920, there had never been but two complaints from the inhabitants of Cheriton, or from those living along the line of the drainage or on Eyre Hall Creek, as to offensive odors from its plant. The first of those two complaints was in 1936, and the other in 1937. Apparently the cause of the complaint made about 1936, was removed during that year when the ditch in Hanby's branch was cleaned out.

There is, therefore, ample and substantial evidence to establish the fact that waste and refuse material from the canning plant of the defendant was in large measure, if not entirely, the cause of the offensive odors cast upon the property of the plaintiff, and that the plaintiff first suffered this injury in 1936. This does not mean that there is not some conflict in this statement of fact in some particulars, both material and immaterial; but the doubt, if any, caused thereby has been resolved by the verdict of the jury in favor of the plaintiff's claims.

In the itemized statement filed with the notice of motion, and in his bill of particulars, the plaintiff alleged damages to his land and home in the sum of $2,000.

The defendant filed a demurrer, a plea of estoppel, a plea of the five-year statute of limitations and the general issue. The trial court sustained the first ground of the demurrer to so much of the notice of motion as sought to recover damages for the pollution of oysters and oyster beds below low-water mark. It overruled the second ground as to damages occasioned to land above low-water mark, to which ruling the defendant excepted. It overruled a motion to strike out the plea of estoppel; and over the objection of the defendant, struck out so much of the plea of the statute of limitations as was argumentative or surplusage.

The trial court, at the instance of the plaintiff, gave to the jury instructions numbered 1, 2 and 3, and at the request of the defendant gave instructions A, D and F, but refused to give instructions B, C, E and G. The defendant excepted to the giving of instructions 1 and 3, and assigned certain grounds therefor.

■ While it filed exceptions to the refusal to give instructions B, C, E and G, no grounds of objection were assigned. Under Rule XXII of this court, such exceptions cannot here be considered. However, a consideration of the questions embodied in the assignments of error cover the propriety of the refusal to give these instructions.

The defendant moved the trial court to set aside the verdict, the material grounds therefor being the same contained in its assignments of error. The motion was overruled, and judgment entered in accordance with the verdict.

The jury found the following verdict: "We, the jury, find for the plaintiff $1,000 for damages to his real estate from the odors and allow him no damage for loss or damages to his oysters."

■■ The verdict denied any recovery to the plaintiff for damage to his seafood above low-water mark. The trial court, by its ruling on the demurrer, had already taken from the jury the question of damages to seafood below low-water mark. In the absence of assignments of cross-error, we need not consider these questions.

The principal questions for our consideration are whether, under the law and the evidence, the plaintiff is entitled to recover damages to his real property occasioned by the acts of the defendant, and whether the cause of action first accrued more than five years before the institution of this action.

The first assignment of error is directed to the refusal of the trial court to sustain the second ground of defendant's demurrer, and to give instructions E and G.

■ Defendant contends that in the absence of negligence, it was not liable for damage occasioned to the lands of the plaintiff above low-water mark, because it had the

right to drain its refuse and waste into the salt, tidal waters. It claims that in so doing, it was exercising, in a lawful manner, a public right, *jus publicum,* rather than a private right, *jus privatum,* and any loss occasioned thereby was *damnum absque injuria.* It admits, however, in its brief that, "It is a settled principle that in the exercise of a private right a nuisance can be created without the element of negligence."

It is true that the notice of motion contains no allegation of negligence, nor does the plaintiff attempt to prove negligence, having expressly disclaimed the necessity therefor during the trial. The whole theory of the plaintiff's case, as shown in the pleadings and throughout the entire proceeding, was that the drainage system as operated created a nuisance. The demurrer does not rely upon failure to allege negligence. There was no motion to strike the evidence of plaintiff for lack of such proof. Although the defendant offered evidence that it operated with the utmost care and caution, the question of negligence, as an essential element of this proceeding, was first raised in the request for instruction E. As we have seen, no grounds of objection were assigned in the exception to the refusal to grant this instruction.

But regardless of the above situation, was the defendant engaged in the exercise of such a public right, known in the law as *jus publicum,* as distinguished from a private right, *jus privatum?*

The defendant is a private corporation engaged in business for private profit. Its charter conferred on it no public duty, nor is it otherwise charged with a public duty. It has no public rights nor quasi-public rights superior to the rights of the public, or the rights of an individual. Its operations are in no wise connected with a public interest. It has no more right to create a nuisance than a private person. The manner in which, and method whereby, it must dispose of its waste and refuse water is not specified in any authority conferred on it. The manner and method of such disposal is a mere incident to the operation of its

plant in a private capacity, and an incident of its private necessity.

Jus publicum is defined in the law dictionaries and encyclopedias as meaning public law or public right in contradistinction to jus privatum, signifying private ownership or the right and title of a private owner. 35 C. J. 428, note 68q. It implies a right in a sovereign or public capacity to be exercised for the interest or benefit of the State or the public, as distinguished from the exercise, in a proprietary capacity, of a right of the sovereign, or of a right possessed by an individual in common with the public. It is, therefore, usually found employed in connection with some right or privilege associated with the sovereign, or in connection with a delegation of right or authority from the sovereign.

Odors which are offensive and disagreeable in such a manner as to render life uncomfortable and damage property rights constitute a nuisance. Joyce, The Law of Nuisances, section 166; Harper, A Treatise on the Law of Torts, section 185. (Va. cases infra.)

In the creation of a nuisance, it appears to be generally settled that the question of negligence, or reasonable care, is immaterial. Joyce, supra, sections 157 and 167; Cooley on Torts (4th Ed.), section 399.

In Virginia, we follow the general rule that it is not necessary to allege or prove negligence when the acts complained of result from a nuisance committed by another in a private capacity. Townsend v. Norfolk Ry. & L. Co., 105 Va. 22, 52 S. E. 970, 115 Am. St. Rep. 842, 4 L. R. A. (N. S.) 87, 8 Ann. Cas. 558; Terrell v. C. & O. Ry. Co., 110 Va. 340, 66 S. E. 55, 32 L. R. A. (N. S.) 371; Southern Ry. Co. v. McMenamin, 113 Va. 121, 73 S. E. 980.

Each of these cases distinguish between rights and duties of a public and of a private nature. Such distinction has frequently arisen where railroad companies were involved. Not even legislative authority to do specific acts which are essential in the exercise of the powers expressly conferred, and in the accomplishment of the purposes for

which it is granted, will authorize other works or acts to be maintained or operated so as to unreasonably interfere with and disturb the rights of others in their property. Not even grants of privileges or powers to corporate bodies, such as public service corporations, confer on them a license, in the exercise of their private rights, to disregard the rights of others without liability for such invasion.

In *Townsend* v. *Norfolk Ry. & L. Co., supra,* liability was imposed for the discharge of smoke, dust, sparks and soot upon the premises of another from the power house of the railway company, even though the power house was necessary for the operation of an electric street railway.

In *Terrell* v. *C. & O. Ry. Co., supra,* a steam railroad company was held liable for the operation of its round house, whereby smoke, cinders, soot, etc., accompanied by foul and offensive odors corrupting the atmosphere, were discharged upon the premises of another, while the locomotives were being prepared for their usual service in the operation of the railroad.

In *Southern Ry. Co.* v. *McMenamin, supra,* liability was upheld for the operation of a coal chute and engine yard, because in the loading and firing of the engines, dust, smoke, soot and gases emanated therefrom, and were cast upon the premises and dwelling house of another so as to create great discomfort and inconvenience.

In the above cases, in the selection of a location for the plant named and the operation of the plant, in connection with the purposes of the corporation, it was held that the companies acted in pursuance of a private capacity as distinguished from a public capacity in the actual transportation of persons and property upon their railway tracks.

.The several cases are illustrative of the point in issue, and contain citations of ample authority to sustain the views expressed.

The cases relied upon by the defendant differ in their facts from the instant case, and the principles held applicable therein are not in conflict with the foregoing rulings.

The case of *Fisher, Trustee* v. *Seaboard Air Line Ry. Co.,*

102 Va. 363, 46 S. E. 381, 1 Ann. Cas. 622, was reviewed and distinguished in *Townsend* v. *Norfolk Ry. & L. Co., supra.* In the *Fisher Case,* the acts complained of arose out of the movement of the trains and locomotives of the railway company upon a trestle adjacent to the premises of the person alleging the injury. It was held that the damages were unavoidable incidents in the exercise of the public right of the railway company to run its trains for transportation purposes.

In *Newport News Shipbuilding & Dry Dock Co.* v. *Jones,* 105 Va. 503, 54 S. E. 314, 6 L. R. A. (N. S.) 247, liability was denied because the act complained of was an essential incident of the authority conferred upon the company by its charter, and because the complainant there acquired his rights subject to the rights of the shipbuilding company.

In *Hot Springs Lumber Co.* v. *Revercomb,* 106 Va. 176, 55 S. E. 580, 9 L. R. A. (N. S.) 894, the lumber company was held to have been exercising a common and paramount right of passage on a navigable stream, and negligence was not sufficiently alleged in the exercise of that right. The question of a nuisance was not raised.

Even if the defendant had the right to natural drainage for the surface water from its land into the drainage system herein described, it did not have the right to collect large volumes of water from artificial sources, and then mingle it with matter likely to cause pollution, and cast it upon another's land. Mr. Minor in Volume I of the Law of Real Property (2d Ed. Ribble), p. 170, citing cases from several states, including *Arminius Chemical Co.* v. *Landrum,* 113 Va. 7, 73 S. E. 459, 38 L. R. A. (N. S.) 272, Ann. Cas. 1913D, 1075, says:

"It is to be observed that, whatever the rights of the upper proprietor may be with respect to the drainage of the surface-water, the authorities seem agreed upon the proposition that he has no right to pollute it while on his land and then allow it to drain, even in natural channels, upon his neighbor's land, and he is liable for injuries to the latter

caused thereby—even, it seems, though he be guilty of no negligence."

Under this assignment of error, the defendant further contends that it is not liable for draining its refuse and waste into the tidal waters, upon the principles stated in the cases of *Hampton* v. *Watson,* 119 Va. 95, 89 S. E. 81, L. R. A. 1916F, 189; *Darling* v. *City of Newport News,* 123 Va. 14, 96 S. E. 307, 3 A. L. R. 748; *Id.,* 249 U. S. 540, 39 S. Ct. 371, 63 L. Ed. 759; and *Commonwealth* v. *Newport News,* 158 Va. 521, 164 S. E. 689.

The facts in each of the cases next above are essentially different from the facts in the instant case. The principles of law applicable in those cases do not apply to the peculiar issue at present before us. Each of those cases involved the disposal of human sewage and filth by a municipality, under legislative authority, into the salt, tidal, navigable waters of the State. The cities were exercising and enjoying a public right,—the *jus publicum.* This court held, and the Supreme Court of the United States affirmed the holding, that "a state may authorize a city to discharge its sewage into the sea, so long, at least, as a nuisance is not thereby created that so seriously interferes with private property as to infringe constitutional rights." (Syllabus 249 U. S. 540, 39 S. Ct. 371, 63 L. Ed. 759).

In the *Hampton Case,* this court expressly said, "The owner of any land bordering upon the sea, may lawfully throw refuse matter into it, provided he does not create a nuisance to others." (119 Va. 95, 89 S. E. 82). This view was approved in the *Darling Case.* In both of these cases, it was further said that it was for the legislative branch of the State government "to say how much pollution it will permit to be emptied into and upon the waters, so long as the owners of the land between low-water and high-water mark are not injured."

This court has recently reaffirmed the doctrine in each of the above cases in *Old Dominion Land Co.* v. *County of Warwick, ante,* page 160, 200 S. E. 619, handed down on January 9, 1939.

In *Commonwealth* v. *City of Newport News, supra,* an injunction was denied the Commonwealth, because it was held that the city, in discharging sewage into the tidal waters, was exercising a public right under authority of the General Assembly of Virginia.

No question of the creation of a nuisance upon high land, or upon land between low-water and high-water mark was involved in either of these cases.

The second assignment of error relates to the giving of instruction number 1, and to the refusal of the trial court to set aside the verdict, on the ground that the "only damage to the enjoyment of plaintiff's home alleged in plaintiff's notice of motion for judgment, resulted from stench and filth created by fish, crabs and other seafood wrongfully killed by the defendant," while under rulings of the court and the jury's verdict, no fish, crabs or other seafood were wrongfully killed or damaged by the defendant.

This instruction, in part, told the jury that the defendant was liable if they believed the "plaintiff's property had been injured in consequence of defendant's discharge of the refuse and waste from its factory," into the waters in question.

The assignment is without merit. The notice of motion alleged that the lands of the plaintiff were made valueless from stench and filth created by the discharge of pollution into the waters of an adjoining creek, and that this pollution also killed fish, crabs and other seafood, which dead matter lined the plaintiff's shore upon the ebb and flow of the tides.

The evidence of both the plaintiff and the defendant relative to obnoxious odors was directed almost entirely to odors created by the decaying and putrefying vegetables,—"refuse and waste,"—cast into the waters by the defendant. There is ample evidence to show that dead fish and other dead seafood, at times, lined the shores of the waters surrounding plaintiff's lands. The cause of such destruction is disputed. Little or nothing is said of the odors resulting from the dead seafood, although the fact that obnoxious odors were created thereby is a natural deduction.

If the offensive odors, in part, arose from the dead seafood, destroyed by reason of the pollution of the waters by the defendant, then such odors were a natural consequence of the acts of the defendant in creating the cause of destruction. Damage to the seafood, for which the defendant was held not liable, is separable from damage caused by reason of a nuisance created as a result of its destruction. Thus, if the seafood was killed by the discharge of pollution from the canning plant, and left on the waters and upon the shores to putrefy and decay, the result was as much the product of the defendant's acts as were the resulting odors from the refuse and waste, which caused slime, slur, and scum to form and remain in the waters and on the shore.

Odors from decaying seafood are undoubtedly as obnoxious and unwholesome as odors from putrefying vegetable matter. As between the two, little choice was offered the owner of the land. The result to him was the same whether the value of his property was destroyed by one or the other.

The language of the notice of motion is sufficient to charge the defendant with responsibility for the creation of the nuisance from which the offensive odors arose.

The third assignment of error is to the action of the trial court in giving instruction number 3. This instruction told the jury that although the defendant's plant and ditches were permanent in character, the plaintiff had no cause of action unless and until he should suffer an injury therefrom; that the five-year statute of limitations did not apply until such time; and more specifically was not a bar to his recovery herein unless the injuries to his property were actually suffered five years prior to the date of the institution of this action.

The grounds of the objection assigned at the time of the giving of the instruction were that the jury would be misled into believing that the statute did not apply unless the plaintiff had owned the property for more than five years prior to the institution of this suit.

The objection gives a forced construction to the language of instruction number 3. The answer is contained in the language of instruction number 2. In number 2, the jury were told that, "The burden is upon the defendant, insofar as it relies upon the statute of limitations, to prove by a preponderance of the evidence that the injuries to the property now owned by plaintiff did occur more than five years prior to the 23rd day of December, 1937."

In its brief, the defendant vigorously contends that the jury should have been told that if they believed defendant's structures and ditches were permanent in character, and that the nuisance created by their construction or operation had been continuous, in the same manner, from the time of the installation and first operation of the ditches, such continuance constituted a permanent injury to the plaintiff's property from such time, and that the cause of action therefor, having accrued more than five years before the institution of this proceeding, its prosecution was barred by the statute of limitations. This principle was embodied in instructions B and C, offered by the defendant, and refused by the trial court.

To support its contention, the defendant relies upon the principles enunciated by this court in *Virginia Hot Springs Co.* v. *McCray,* 106 Va. 461, 56 S. E. 216, 10 L. R. A. (N. S.) 465, 10 Ann. Cas. 179, and *Worley* v. *Mathieson Alkali Works,* 119 Va. 862, 89 S. E. 880.

In those cases it was shown that damages resulted from the erection of permanent structures, the use of which produced the injury complained of immediately after the structures were first operated, the consequences of which continued in the normal course of such operations, and might have been expected to continue indefinitely. It was held that claims for damages therefor were barred unless action was brought within the number of years prescribed by the statute of limitations, because the causes of damage were permanent in their character, and the cause of action therefor accrued when the damage originated.

In the instant case, the entire evidence shows no appreciable damage to the specific property of the plaintiff prior to 1936. All of the plaintiff's witnesses testify that there was no appreciable injury thereto prior to 1936. It is true some witnesses for the defendant, who live close by the plaintiff's premises, state that prior to 1932, they had smelled disagreeable odors in the neighborhood. Such occurrences were rare and infrequent, and then appeared under varying circumstances. The occasions were not of sufficient importance for them to make complaint, nor to take action to abate the cause. The defendant even boasted that for sixteen years it had no direct complaint of such annoying odors, and only two before the institution of this suit. It denies responsibility for the cause of the offensive odors prior to 1936, and immediately thereafter declares that the odors were first created at the time of the construction and first operation of the plant, and have continued in the same manner to the present time. It is manifest that both positions cannot well be sustained.

We are of the same opinion as the trial judge, that the record contains no evidence which shows that any actionable injury was occasioned to the property purchased by Steelman prior to 1936.

This case, then, comes within the ruling and principles followed by this court in *Southern Ry. Co.* v. *Leake,* 140 Va. 438, 125 S. E. 314; *Southern Ry. Co.* v. *Watts,* 134 Va. 503, 114 S. E. 736; *McKinney* v. *Trustees of Emory and Henry College, Inc.,* 117 Va. 763, 86 S. E. 115; *Norfolk & Western Ry. Co.* v. *Allen,* 118 Va. 428, 87 S. E. 558; *Southern Ry. Co.* v. *McMenamin, supra.*

In these cases a decisive question was, whether the cause of action accrued within the period fixed by the statutes of limitations. The injuries complained of were not due to the erection of the structures, but to the operation of the structures, or some other operation in connection therewith.

The erection of a lawful structure, without injury to another, does not of itself give rise to a cause of action, nor can a cause of action accrue until an injury has been

sustained. The statute does not begin to run until the cause of action arises. This is but another way of saying that one cannot maintain an action brought before an injury has been incurred. The cause of an action for damages must be based upon injuries received, and not for injuries feared. It is readily conceivable that damages feared may never be inflicted.

In this connection, Prentis, J., speaking for the court, in *Southern Ry. Co.* v. *Leake, supra,* said, in approving Judge Kelly's opinion in *Southern Ry. Co.* v. *Watts, supra,* and citing other authorities:

"Undoubtedly where there is a permanent structure, causing immediate damage to real estate, the cause of action at once arises, but where the damage to the real estate arises from a cause not then immediately effective, then a different principle is applicable and the cause of action does not arise until the injury can be shown." (*Southern Ry. Co.* v. *Leake,* 140 Va. 438, 441, 125 S. E. 314, 315).

The cases relied on by the defendant are wholly different in their facts, and are easily distinguished from the present case. The reports abound with cases illustrative of the principles herein referred to. To undertake to review all, or many of them, would extend this opinion to an unreasonable length.

In the instant case, the damages were not occasioned by the erection of the factory, or the mere improvement and straightening of the ditches and drains. They were occasioned by subsequent acts incidental to the operation of the plant: by the dumping of vegetable matter and juices into the drains, which upon decay and putrefication therein, set up a pollution in the waters. Multiplying the amount of the vegetable matter and juices in the water, and expediting its passage to the shores of plaintiff's land, were factors in the creation of the nuisance, both in point of volume and time of creation.

In the last assignment of error, the defendant contends that the verdict is contrary to the law and the evidence, and without evidence to sustain it. It insists that the evi-

dence shows that Steelman has made a profit from his seafood business conducted on the land in question since his purchase thereof, and that in November, 1937, when he undertook to secure a loan from a bank, he made a financial statement showing his property to have increased in value beyond the purchase price and improvements.

There is no merit in this assignment. Certainly it cannot be contended that offensive odors tend to increase the value of any land whether for home or business purposes. One does not usually place too small a value on collateral offered as security for a loan. Whether there are other factors, including marketability of the real estate or otherwise, which operated to increase the value of the real estate, we are not told; but the evidence shows that regardless of any other conditions, the land would be more valuable if it were not for the offensive odors surrounding it.

The defendant urges that the operation of its business is of such a vital necessity to the farmers and laboring classes of Northampton county in offering a market for produce and employment, that to hold it liable for the damages here sought might result in making it impossible for its business to continue. We know of no more complete answer to this argument than the opinion of this court delivered by Keith, P., in *Townsend* v. *Norfolk Ry. & L. Co.,* *supra,* page 49, 52 S. E., page 970, and by Judge Buchanan in *Arminius Chemical Co.* v. *Landrum, supra,* page 14, 73 S. E., page 459.

. The principle of the ancient and honorable maxim, *sic utere tuo ut alienum non laedas* (so use your own property that you do not injure another) is as important today for the protection of the rights of society and of the individual as it has been during all the centuries it has been recognized and followed by courts of justice. Any departure therefrom would be subversive of fundamental private rights. The necessity of one man's business cannot permit it to be operated at the expense of another's rights without an allowance of compensation for the deprivation of such rights.

However important may be the successful operation of the business of the defendant to its stockholders, or to the farmers and laborers in the surrounding country, that cannot be the standard by which to measure the rights of others, or a reason to confer upon it the right to destroy or to injure the property of another without just compensation to the injured person. "But if a business be necessary or useful, it is always presumable that there is a proper place and a proper manner for carrying it on; in other words, that it may be carried on without being a nuisance." Cooley on Torts, section 433. It is the annoyance and injury to another that the law regards, and not the business creating the annoyance.

The fact that other litigation is pending between the defendant and other parties involving the question here before us, cannot affect the result in this case. We are here dealing solely with the case in hand. In the event of further litigation between the defendant and other parties, we can determine the questions there involved only when they arise.

We are of opinion that there is sufficient evidence to sustain the verdict of the jury. We discover no error in the rulings of the trial court. The judgment complained of is affirmed.

*Affirmed.*