# Richmond

## GEORGE H. ROSS, JR. v. FRANK SCHNEIDER AND NORTHERN NECK ELECTRIC COOPERATIVE, ETC.

October 11, 1943.

Record No. 2683.

Present, All the Justices.

The opinion states the case.

*R. O. Norris, Jr., F. V. Watkins* and *Hunton, Williams, Anderson, Gay & Moore,* for the plaintiff in error.

· *W. W. Beverley* and *R. Carter Scott, Jr.,* for Northern Neck Electric Cooperative, defendant in error.

*William A. Wright* and *T. Coleman Reedy,* for Frank Schneider, defendant in error.

BROWNING, J., delivered the opinion of the court.

Frank Schneider, the plaintiff in the trial court, instituted an action at law by notice of motion for judgment against George H. Ross, Jr., the plaintiff in error, and the Northern Neck Electric Cooperative, a codefendant.

The action was predicated upon injuries to the plaintiff, occasioned by the alleged joint negligence of the defendants. The injuries suffered arose out of the fact that the plaintiff, Schneider, while assisting in building a barn for the defendant, Ross, came in contact with the wires of the defendant, Northern Neck Electric Cooperative, which were strung over the lands of Ross and carried a deadly current of 7200 volts.

The evidence, which is in narrative form, must be stated in the light most favorable to the plaintiff and the

Northern Neck Cooperative for the reason that the verdict of the jury was in their favor and it was confirmed by the trial court.

The evidence, in brief, is that the defendant, George H. Ross, Jr., owned a farm in Richmond county, Virginia, called "Wilna"; that situated thereon is a dwelling and other buildings; that he was employed by the U. S. Maritime Commission, which required him, for most of the time, to be stationed at Mobile, Alabama, and New Orleans, La.; that his visits to his Virginia home were at rare intervals. While visiting his home for a day or so in September, 1941, he conceived the notion of building a barn of a certain type on this farm; he happened to meet on the road Mr. John R. Self, whom he knew, and who had done some carpentry work for him; he told Self what he had in mind and learned from him that he had built for himself the type of barn which he, Ross, was contemplating; that arrangements were then made for Mr. Self to do this work; Ross was to furnish the materials, the greater part being then in hand at "Wilna", and such as were not there were to be purchased by Self at Tappahannock or elsewhere and either charged to the account of Ross or the bills sent to him for payment. Self was to secure and employ such help as he needed and he was to be paid current wages, *per diem*, as were his helpers. He described this feature of the transaction in this way: "I charged him the same for my services that I charge everyone else and charged him the same wages for the men's services who helped me with that job, and I charged him by the day and he paid me by the day. * * * Regardless of what it cost to build the barn, I couldn't have lost anything and I couldn't have made any more than my daily wages."

The barn was to be built as Mr. Self had built his own. Ross showed him where he wanted it located and designated the place by putting a stake in the ground. Immediately over this place ran the wires of the Northern Neck Electric Cooperative. When the building progressed far enough for putting on the roof, the lower wire was found to be about three feet above the roof and the upper one was

some two or three feet higher. The plaintiff was one of Self's helpers and in constructing the roof he nailed a board across the rafters to prevent him from slipping, his shoes, as he termed it, "being slick". He stood up to test the strength of the board and in that way his body came in contact with the two wires, forming a short circuit, which subjected him to the voltage of the high tension wires, burning him very badly and precipitating him to the ground. He was rendered unconscious and was still so when he reached the hospital in Richmond, where he was taken for emergency and permanent treatment, and where he had to remain for about three months, under the care of surgeons and nurses. After having been discharged it became necessary for him to return to the hospital, staying for a period of more than two weeks. Skin grafting had to be employed and his injuries were termed permanent by the doctors.

When the work was begun, seeing the wires overhead, he asked Mr. Self if there was any danger on account of them. The response was that they were harmless. And after the building had progressed to the point of putting on the roof the plaintiff again inquired if they were safe and Mr. Self took hold of the lower wire, shaking it, as evidence that there was no danger.

Like questions were asked of Mr. Ross by Mr. Self before the work was begun. He assured Self that there was no danger, stating that he had never used the current; had never asked to be connected with the system and that the wires were not electrified.

In 1937, the Northern Neck Electric Cooperative constructed its lines from Warsaw through Richmond and Lancaster counties for the purpose of supplying electric current facilities to the inhabitants of the rural communities. It is a non profit organization which secured its funds for construction purposes from the Rural Electrification Administration of the United States Government. Its high tension wires carried a current voltage of approximately 7200 volts, which is a volume of dangerous force. The main line was projected near the farm of Mr. Ross. He

made application to have his premises connected with it and this went to the extent of signing a form application and paying a membership fee of $5.00, but his application was never actually approved by the company's committee, which was a requisite to membership. A spur line was built by the company to supply the Ross farm. At first it was constructed diagonally across one of his fields and at that time a transformer was installed where the spur line diverted from the main line, the office of which is to reduce the voltage. Mr. Ross asked that the spur line be changed to run along the margin, between his lands and those contiguous until it reached the corner and there turn almost at right angles and run to his garage, which was done. The line was energized on April 16, 1938, and so was the spur line, it being a part of the company's primary system, as was shown by the officials and witnesses for the defendant company.

This was described by Mr. R. R. Denison, general manager of the company, in this way: "The primary spur line constructed for the purpose of supplying Ross was not constructed as a separate unit, but was constructed at the time of the construction of the main system and was constructed as an integral part of the main distribution system, was permanently connected thereto, and when the main system was energized the line serving Mr. Ross was energized."

When the company changed the spur line it took away the transformer, which was needed elsewhere in its system. This is not of particular moment but we mention it because it is emphasized as a dereliction of the company. The fact is that it was not needed where it was first installed because Mr. Ross was not using the current and had not, and never did, apply for it.

It is alleged by the petitioner that he did not know that the spur line wires were live, that is, he did not know that the current had been turned on. Mr. Denison, the general manager of the company, testified that when the line was energized in April, 1938, the consumers were notified of it,

and while he could not make oath that the notice was sent to Mr. Ross, he was strongly of the belief that it was.

The petitioner emphasizes the fact that no cut-outs or fuses were employed by the company as a matter of safety. There is sharp conflict between the experts who testified for the petitioner and those for the company as to whether the presence of these devices was required under standard electrical rules and requirements. One set of experts testifying one way and the other the opposite.

The jury and the trial judge saw the witnesses and heard them and they chose to accept the version which is against the petitioner.

There was just as positive disparity between the testimony of the experts as to the question of whether or not spur lines are regarded in the electrical field as part of the primary system of electrical companies, furnishing current to consumers. The company here urges that it is and its witnesses so testified. The jury and the court took that view of it.

■ That upon issues of fact this court is bound by the jury's verdict, approved by the court, is not to be controverted. Courts of last resort have said this so often and it is so completely buttressed by text writers, annotators and collaborators of the law as to be beyond cavil. This, of course, is subject to the conditions that there must be credible evidence upon which to base the verdict and there must be an absence of fraud or prejudice, the presence of either of which would vitiate it. Neither of these conditions or exceptions inhere here. The verdict was in these words and figures: "We the jury upon the issue joined find for the plaintiff against the defendant, George H. Ross, Jr., only, but not against the Northern Neck Electric Cooperative, and we ascertain and fix the damages of the plaintiff at $5,800.00."

We quote it because its wording makes it very patent that the jury had a clear conception of the issues and its conclusions as to them.

The petitioner is insistent in urging that Self was not an employee or agent or servant of Ross in the performance of the work done but that he was an independent contractor, and that the plaintiff was his, Self's, agent, employee or servant.

If this were so there might be a serious question as to the liability of the petitioner but, unfortunately for him, we cannot accept this view. It is needless to elaborate upon this feature of the controversy, for, as we see it, there is not an incident which sustains this contention. This court has quite recently had this question before it in the case of *Texas Co.* v. *Zeigler*, 177 Va. 557, 14 S. E. (2d) 704, in which there is an extended discussion of the defense of an independent contractor. In that case there were some rather strong incidents upon which the Texas Company based its contention that Zeigler was an independent contractor. We held against the contention.

The case of *Craig* v. *Doyle*, 179 Va. 526, 19 S. E. (2d) 675, also deals with this question. In that case Doyle was much the same sort of mechanic as Self is in this. He agreed to remodel the Craig residence by making it an apartment for two families. The consideration was the cost of the work plus 10%, Doyle in addition to receive $1.00 per hour for the time he made on the job as wages during the construction. He also agreed to employ the necessary help as cheaply as it could be had. The Craigs agreed to furnish to Doyle the cash each week to pay for all labor performed and at completion to pay the balance of the cost of the entire transaction.

We held that the status of Doyle was that of an employee and this holding was predicated upon the power of the employer to control the work done. That Mr. Ross had that power in the case here is quite evident. Whether or not he chose to exercise it is not important.

In the case of *Barber* v. *Textile Machine Works*, 178 Va. 435, 17 S. E. (2d) 359, this question is elaborately discussed and the *Texas Co. Case*, *supra*, is distinguished from the case of *Griffith* v. *Electrolux Corp.*, 176 Va. 378, 11 S. E.

(2d) 644. See also *Hann* v. *Times-Dispatch Pub. Co.*, 166 Va. 102, 184 S. E. 183; *In re Murray*, 130 Me. 181, 154 A. 352, 75 A. L. R. 720.

[3] There are numerous criteria which have been said by the courts and the text writers to be important as tests in determining whether the relationship between parties engaged in a transaction, as we have here, is that of an independent contractor or servant as applied to the party performing the service or doing the work. The presence of one or more of them is not necessarily conclusive of this status. The two of those which seem to be most relied upon, as we have indicated, is, first, in which party lies the control over the work and, second, is there present in the particular case the existence of a contract for the doing of certain work at a fixed price.

Let us apply these tests to the case in hand. In *In re Murray, supra*, it is said: "Authorities are numerous and uniform that the vital test is to be found in the fact that the employer has or not retained power of control or superintendence over the employee or contractor. 'The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent.'" *Tuttle* v. *Embury-Martin Lbr. Co.*, 192 Mich. 385, 158 N. W. 875, 879, Ann. Cas. 1918C, 664.

Indicative of this right of control or interference, the letter of Mr. Ross to Mr. Self of September 26, 1941, written in Mobile, Alabama, is noteworthy. A sketch was enclosed with the letter showing the spaces for the concrete foundations for the corn house, which term seems to have been used interchangeable with the word "barn". Instructions are therein given about cutting the strips for the floor and their dimensions. Self is told that he can get what rough lumber he may need in "Wilna" woods and have Sanford cut it. He is told to get the foundations set as soon as possible so they would be drying out. He is told where to buy the cement and building paper for the roof, and nails, and

Mr. Ross expresses his appreciation of Self's goodness in looking after the job for him. Certainly the significance of this is to the effect that Self was doing the work as any ordinary carpenter would and that it was done as Ross wished it, and as he had the right to require.

In the case last cited (*In re Murray*, page 724) this is said: "One of the means of ascertaining whether or not the right to control exists is the determination of whether or not if instructions were given they would have to be obeyed."

Can it be doubted that Self would be obliged to adopt the instructions contained in the Ross letter?

In the same case this is said at page 724: "The measure of compensation is also important, for where it is based upon time or piece the workman is usually a servant, and where it is based upon a lump sum for the task he is usually a contractor."

It will be remembered that Mr. Self testified, "I charged him by the day and he paid me by the day." We think the conclusion is sound that these incidents furnish unerring indicia of the status of Self as an employee or servant.

In connection with what we have said it will be borne in mind that Ross was insistent that the spur line be maintained as it was, that is, not discontinued and taken away by the company. This is shown by the letters of Mr. Ross as well as the testimony of Mr. Denison, who said that Mr. Ross came to his office and asked that it be not discontinued. In other words the line was continued for his accommodation and convenience.

With respect to the negligence of Mr. Ross it will be noted that the spur line was built where he wanted it to be and at his direction. He chose the location for the barn, or corn house, which was directly under the wires which were there for his convenience and future use. When his employee, Mr. Self, noticed the wires he asked him if they were dangerous and he was assured by Mr. Ross that there was no harm in them; that he had never used them. Mr. Ross could

have ascertained if the wires had been energized by simply calling the company's office at Warsaw. There were telephone connections at his house, which was close at hand. As we have seen, Mr. Self was the agent or employee of Mr. Ross and when the plaintiff asked Self if there was any harm in the wires he was told that Mr. Ross had said they were harmless; that he had never ordered any current. These men knew the danger of charged electrical wires and as they had to work in proximity to them they wanted to be assured that they would not be subjected to a lurking hazard.

They had a right to rely upon the assurances of the owner of the premises who was having the work done.

It would have been so easy for Mr. Ross to have informed himself but he neglected to do so. The project was his. The farm was his. The electric line was for his comfort and convenience and it was his business to see that his workmen had a safe place in which to work.

██ ██ Negligence is a question of fact for the jury. It found a verdict against Mr. Ross and we cannot say that there was not credible and cogent evidence upon which such verdict could be based.

We now come to the consideration of the instructions which the court gave and which action is the subject of alleged error. The sole reason given by the petitioner for his objection to the instructions is that their vice was apparent upon their face.

██ Rule XXII requires that all objections to instructions requiring a ruling or judgment of the trial court, shall state with reasonable certainty the ground of such objection, and, unless it appears from the record to have been so stated, such objection will not be considered by this court. This is a mandate of the court and its purpose is that the trial judge may be informed of the precise points of objection in the minds of counsel so that it may be advised and rule intelligently. It is a salutary requirement and must be adhered to unless the exceptions engrafted upon it apply. In this case they do not. It is very clear that the general

objection, which we have stated, does not meet the requirement.

The following cases make plain this court's attitude on this question: *Smith* v. *Commonwealth*, 165 Va. 776, 781, 182 S. E. 124; *Barnes* v. *Bess*, 171 Va. 1, 9, 197 S. E. 403; *Webster Co.* v. *Steelman*, 172 Va. 342, 355, 1 S. E. (2d) 305; *Norfolk* v. *Hall*, 175 Va. 545, 553, 9 S. E. (2d) 356.

The instructions granted became the law of the case. It seems to us that they apply admirably to the evidence and instruction No. 11, in plain and concise terms, puts starkly before the jury the conduct of the Northern Neck Electric Cooperative in relation to the accepted standards, rules and regulations of the electric industry and also that of Ross in authorizing the barn or corn house to be constructed under the company's spur line without its knowledge and consent.

There was ample evidence upon which the jury could say that the cooperative had complied with the requirements of the safety code of the electrical industry and that its system was constructed in accordance with the accepted policies of the Rural Electrification Administration. This is found in the testimony of Kinsley McWorter, electrical engineer, and that of E. W. Mullikin, Superintendent of Operations for the Virginia East Coast Utilities. These witnesses cited the Virginia Electric & Power Company and the Virginia East Coast Utilities as instances of the employment of similar methods of construction and operation of similar service lines.

The motion to dismiss the writ of error is without substantial merit and it is overruled.

For the reasons stated the judgment of the trial court is affirmed.

*Affirmed.*