## Richmond

LAKE BARCROFT ESTATES, INCORPORATED, ET AL. v. WILLIAM J. McCAW, JR.

June 18, 1956.

Record No. 4521.

Present, Hudgins, C. J., and Eggleston, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Armistead L. Boothe* (*Booth, Dudley, Koontz & Boothe*, on brief), for the plaintiffs in error.

*David L. Carpenter* (*Ryland, Winston & Carpenter*, on brief), for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

William J. McCaw, Jr., hereinafter called McCaw, sued Lake

Barcroft Estates, Inc. and Barcroft Lake Shores, Inc., hereinafter called Barcroft, alleging that on May 5, 1953, there was a flooding of Holmes Run; that McCaw's real estate and personal property were damaged by the deliberate and wilful opening of flood gates by Barcroft, which released more than the normal flow of water over the dam and caused the damage complained of.

Barcroft's answer admitted the flooding of Holmes Run; also that McCaw sustained damages thereby. It was denied, however, that their employees opened the flood gates as alleged, it being asserted that the gates opened automatically with the rising of the lake, caused by a flash flood.

The case was tried on the issues joined, resulting in a verdict for the plaintiff. Barcroft moved for judgment *non obstante veredicto*, or in the alternative for a new trial. The court overruled the motion and we granted a writ of error.

The record discloses that the stream "Holmes Run" flows into defendants' property "Lake Barcroft". The lake is formed by a masonry dam, topped by a wooden superstructure. Leaving the dam, Holmes Run resumes its course and continues through the McCaw property which is located in the valley, three miles below. At its source, Holmes Run is about 400 feet above sea level; at the dam it is 210 feet, and as it passes the McCaw property it is approximately 60 feet above sea level.

The spillway at the dam is 205 feet above sea level. The superstructure consists of twenty four wooden gates, each placed between concrete posts; the gates are five feet high and are pivoted on the posts one foot seven and one-half inches from the bottom. They are designed to open automatically when the water sweeps over them at a depth of one and one-half inches. All the gates are not supposed to tip at the same time, each being designed to tip as the water pressure increases. The gates can also be opened manually, and are closed by the use of a winch.

On the day in question there was an unusually heavy rainfall which reached its peak between the hours of 5:00 and 7:00 p. m. At the beginning of the rain the lake was filled with water and the rain caused its level to rise.

John F. Newlon, a witness for the plaintiff, testified that he went to the dam at about 5:50 p. m. and talked with the gate keeper. Without objection, he was permitted to relate the conversation which ensued. Newlon testified that he asked the gate keeper: "What are you going

to have to do? Are you going to have to dump water?" (referring to the fact that the lake was full and additional water was coming in). The gate keeper replied: "I will have to do something. I do not know what I will have to do." As Newlon left for his home the gate keeper promised that he would telephone him if he had to "dump water". Newlon arrived at his home about 6:20 p. m. and at approximately 6:25 Anderton, the gate keeper, called. Newlon asked him if he had to "dump water", to which Anderton replied: "It is either dump it or the whole thing will come out here". Newlon then asked him to "hold the gates", whereupon Anderton replied, "It is too late. I had to let the whole thing go. I am sorry. I had to let them go. It is either that or the whole thing will come out of here, the whole thing." Newlon stated that he hung up the telephone and prepared immediately to evacuate his family. About five minutes later his property, car and house were deluged with a great swell of water. The situation created was of such a disastrous nature that it became necessary to call rescue squads to assist him in getting his family from his home to higher ground.

The record further discloses that about 9:30 p. m., after the water had begun to subside, McCaw, together with Russell Reed and Guy A. Crider, went to the dam and talked to one Lawson Booth, a paid employee of Barcroft, who was assisting Anderton in performing his duties at the dam. Crider, without objection, stated that he asked Booth if he opened the gates, to which Booth replied that a man had been to the dam earlier and asked him about the gates and that he told him if he lived down there he had "better go down and get his family out", that he was going to have to open the gates. Booth then said to Crider and McCaw, "Boy, I bet they got flooded out down below". Booth was then asked if he opened the gates, to which he replied that he "had to open the gates", if he had not "the dam would have busted". Booth was again asked if he opened the gates, and he replied: "Yes, we did. I bet it really washed out down below". Without objection, Booth's statements were corroborated by Reed and McCaw.

Numerous witnesses testified as to the unusual manner in which the water crossed the fields on to the McCaw property. It was described as "rolling over, just like tidal waves".

The assignments of error present two questions, the first being: Was the jury's verdict contrary to the law and the evidence and without substantial evidence to support it?

At the request of McCaw the court instructed the jury that if it believed from the evidence that the defendants, acting through their agents, operated the dam at Lake Barcroft in such a manner that the gates located upon the dam opened and in so doing allowed more water to leave Lake Barcroft than entered the lake during any given period of time between the approximate hours of 5:30 p. m. and 6:30 p. m., then the jury should find such conduct to constitute negligence "for which the defendant is liable to the plaintiff, if such negligence was the proximate cause of the plaintiff's damage." Further, at the request of McCaw, the jury was instructed that it could draw all reasonable inferences from the evidence and testimony presented at the trial, "and the fact that no one witnessed the acts which the plaintiff complains of does not prevent you from finding that the defendants' agents were negligent in operating the gates at Lake Barcroft."

No objection was made to these instructions and thus they became the law of the case. *Acme Markets* v. *Remschel*, 181 Va. 171, 24 S. E. 2d 430; *Ross* v. *Schneider*, 181 Va. 931, 27 S. E. 2d 154.

Clearly the jury was justified in finding that the gates had been manually opened, which act was the proximate cause of the damage complained of.

■ The second assignment of error is: "The court erred in refusing to permit defense counsel to cross examine witness Newlon so as to show his bias by asking him if he himself had not filed and prosecuted a cause of action against the defendants arising from the flood of May 5, 1953."

Suffice it to say, the court did not refuse to permit defense counsel to cross examine Newlon for the purpose of showing the facts contained in this assignment. When ruling on defendants' request the court stated:

"I am going to restrict it (the cross examination) to any prior inconsistent statements and he can be questioned on that, and I think in that connection that the instance of those statements can be testified to; that is to say, that he could be asked whether he made those statements in a similar suit which he had against the same defendant."

With the court's permission, Newlon was vigorously cross examined. He was asked, among other things: "Mr. Newlon, do you recall making the following statement on August 10—and I read from page 7 of your testimony in the suit that you brought against Lake Barcroft, and I quote, 'I talked to the gate keeper and asked him if

they had dumped those gates, at which time he told me yes'." And again counsel for Barcroft asked: "No, sir, I asked you if you stated on August 10, at your trial, if you talked to the gate keeper and asked him if they had dumped those gates." Thus counsel for Barcroft was permitted to attempt to show Newlon's bias by virtue of the fact that he had prosecuted a similar cause of action against the defendants.

Counsel for Barcroft suggested in argument before us that the court should have permitted him to examine Newlon on prior consistent statements made at the former trial of Newlon's case against Barcroft. The record discloses that counsel did not request the court for such permission nor did he attempt to avail himself of any such supposed right. He took full advantage of the requested right, which was accorded him by the court, in an effort to prove that Newlon did not stand indifferent between the parties in his testimony. He was permitted to show any fact or circumstance which might have affected the credibility of the witness. 20 M. J., Witnesses, § 72, page 531.

There is no merit in either assignment of error, and the judgment is

*Affirmed.*