967 F.2d 764
 35 ERC 1552, 22 Envtl. L. Rep. 21,154
 COALITION AGAINST COLUMBUS CENTER; Selma Arnold; Ross
Graham; Al Hehn; Columbus Center Travel, Ltd.;
Coalition Against Lincoln West, Inc.,
Plaintiffs-Appellees-Cross-Appellants,
v.
CITY OF NEW YORK; the Board of Estimate of the City of New
York; Department of Housing Preservation & Development of
New York City; Metropolitan Transportation Agency;
Triborough Bridge and Tunnel Authority; the New York City
Industrial Development Agency; Coliseum Associates,
Defendants-Appellants-Cross-Appellees.
 Nos. 564, 577 and 701, Dockets 91-7746, 91-7754 and 91-7846.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1991.
Decided June 22, 1992.
 
 Linda H. Young, New York City (Victor A. Kovner, Corp. Counsel, Antonia Levine, Daniel Turbow, Ellen B. Fishman, Jerome Tarnoff, Theodore S. Steingut, Berger Steingut Tarnoff & Stern, on the brief), for Mun. defendants-appellants-cross-appellees.
 Robert P. LoBue, New York City (Stephen P. Younger, David C. McIntyre, Steven Russo, Patterson, Belknap, Webb & Tyler, on the brief), for defendants-appellants-cross-appellees Metropolitan Transp. Authority and Triborough Bridge & Tunnel Authority.
 Gaines Gwathmey III, Jay Cohen, Robert A. Atkins, Joseph Brennan, Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Paul Selver, Elise Wagner, Brown & Wood, submitted a brief), for defendantappellant-cross-appellee Coliseum Associates.
 John T. Van Der Tuin, New York City (Stuits, Balber, Horton & Slotnik, Jerry H. Goldfeder, Pesetsky, Goldfeder & Bookman, on the brief), for plaintiffs-appellees-cross-appellants.
 Before: NEWMAN, KEARSE, and CARDAMONE, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal involves an attempt by various citizen groups, individual neighbors, and local businesses to block the sale and redevelopment of a 3.4-acre site on the western side of Manhattan's Columbus Circle for alleged noncompliance with applicable environmental and regulatory requirements. The site is currently occupied by the New York City Coliseum and an adjacent 26-story office building. Defendants are the developer of the site, Boston Properties, acting through defendant Coliseum Associates, as well as numerous municipal entities--the City of New York (the "City"), the Board of Estimate of the City of New York, the Department of Housing Preservation and Development of the City of New York, the Triborough Bridge and Tunnel Authority ("TBTA"), the Metropolitan Transportation Authority (the parent of TBTA), and the New York City Industrial Development Agency ("NY IDA"). The proposed project would replace the existing buildings and underground parking garage at the site with a new garage and a residential, office, and retail building of more than 70 floors.
 
 
 2
 Defendants appeal from the July 10, 1991, judgment of the District Court for the Southern District of New York (Shirley Wohl Kram, Judge), granting summary judgment to plaintiffs on their claim under the so-called "citizen suit" provision of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C.A. § 7604 (West 1983 & Supp.1992), to require the defendants to comply with the Act as implemented by New York's State Implementation Plan. Coalition Against Columbus Circle v. City of New York, 769 F.Supp. 478 (S.D.N.Y.1991). Defendant Coliseum Associates appeals from the portion of the judgment holding it jointly and severally liable for a potential fine of at least $15 million for future violations of the Act. Plaintiffs cross-appeal from the dismissal on summary judgment of their pendent claims alleging that: (1) the garage portion of the development required a permit pursuant to N.Y.Comp.Codes R. & Regs. tit. 6, Part 203 (1983) ("NYCCRR"); (2) if a Part 203 permit is not required, the project must obtain a City Planning Permit under the New York City Zoning Resolution, Art. I, ch. 3; (3) the proposed project involves defendant NY IDA in the construction or rehabilitation of residential housing, in violation of its enabling legislation, N.Y.Gen.Mun.Law § 917(c) (McKinney 1986 & Supp.1992); and (4) the agreements ratifying the proposed project must be annulled because of violations of state conflict of interest laws, N.Y.Pub.Off.Law § 73(7) (McKinney 1988).
 
 
 3
 We reverse the portion of the judgment granting summary judgment to plaintiffs on their Clean Air Act claim, and grant summary judgment in favor of the defendants on this issue. We affirm the portion of the judgment granting summary judgment to the defendants on the pendent claims for the reasons set forth in the District Court's opinion. 769 F.Supp. at 491-98.
 
 Facts
 
 4
 A. Regulatory framework under the Clean Air Act. We have previously canvassed the "complex interplay" between federal and state environmental requirements, see Wilder v. Thomas, 854 F.2d 605, 608-10 (2d Cir.1988) (Wilder II ), cert. denied, 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989), and therefore provide only the details necessary for an understanding of the present dispute. The CAA entrusts the Environmental Protection Agency ("EPA") to promulgate national ambient air quality standards ("NAAQS") for certain pollutants including carbon monoxide ("CO"). 42 U.S.C. § 7409 (1988). Each state must develop, subject to EPA approval, a State Implementation Plan ("SIP") to implement, maintain, and enforce the NAAQS for each regulated pollutant. 42 U.S.C.A. § 7410 (West Supp.1992).
 
 
 5
 In 1977 Congress amended the Act, Pub.L. No. 95-95, §§ 101-406, 91 Stat. 685 (1977), to extend the deadline for attainment of carbon monoxide standards in "nonattainment" areas, including New York. 42 U.S.C. § 7502(a)(2). See generally Council of Commuter Organizations v. Gorsuch, 683 F.2d 648, 651-52 (2d Cir.1982) (describing 1977 amendments). These nonattainment areas were required to submit revised SIP's to comply with the stringent so-called "Part D" requirements, 42 U.S.C. §§ 7501-7508, or face a moratorium on the construction or modification of major stationary sources of pollution. Id. § 7410(a)(2)(I). The Part D requirements were designed, in part, to allow the states to attain the NAAQS for carbon monoxide and ozone "as expeditiously as practicable" but no later than December 31, 1982. Id. § 7502(a)(1). States such as New York with especially severe pollution problems could receive an additional extension to December 31, 1987, by complying with additional requirements. Id. § 7502(c). The New York revised carbon monoxide SIP at issue here was submitted in January 1984.
 
 
 6
 The 1990 amendments to the Clean Air Act, Pub.L. No. 101-549, §§ 101-1101, 104 Stat. 2399 (1990), provided varying dates for attainment of the NAAQS for carbon monoxide depending on whether the EPA classified an area as one with "Moderate" or "Serious" nonattainment. 42 U.S.C.A. § 7512(a)(1) (West Supp.1992). Because the EPA has classified New York City as a "moderate" nonattainment area for CO, the City must attain the primary NAAQS for CO "as expeditiously as practicable" but not later than December 31, 1995. Id. § 7512(a)(1). Any moderate nonattainment area that fails to meet the 1995 deadline will be reclassified as "serious," id. § 7512(b)(2), and receive five more years to achieve compliance, id. § 7512(a)(1). The amendments require the states to submit a revised SIP to implement, maintain, and enforce the new NAAQS deadlines. Id.
 
 
 7
 The current New York State SIP relies primarily on Environmental Impact Statements ("EIS") to evaluate projects that may have a significant impact on environmental quality. See New York State Air Quality Implementation Plan for Control of Carbon Monoxide and Hydrocarbons in New York City Metropolitan Area § 3.6 (rev. Jan. 1984). As an indirect source of pollution, the proposed project, with its likely effect on vehicle traffic,[1] was required to submit an EIS by the State Environmental Quality Review Act ("SEQRA"), see N.Y.Envtl.Conserv.Law § 8-0109(2) (McKinney 1984 & Supp.1992). EIS's are also mandated under similar circumstances by the National Environmental Policy Act, 42 U.S.C. § 4332 (1988) (EIS required for certain major federal actions) and under the New York City Environmental Quality Review, N.Y. City Charter § 197c.
 
 
 8
 At issue on this appeal is section 3.6 of the New York State SIP, which describes the carbon monoxide problem in the New York City metropolitan area, describes the state statutory environmental review process for indirect sources of pollution, and makes specific commitments for the use of the environmental review process in New York City, Nassau County, and Westchester County. Subsection 3.6(A) of the SIP provides specific commitments for New York City to identify and mitigate violations of the NAAQS for carbon monoxide and provides in pertinent part that:
 
 
 9
 To further ensure that the carbon monoxide standard is attained in New York City, if an EIS for a project proposal identifies a violation or exacerbation of the carbon monoxide standard, then the City commits to assure that mitigating measures will be implemented by the project sponsor or City, so as to provide for attainment of the standard by December 31, 1987 and maintenance of it thereafter.
 
 
 10
 Section 3.6 of the New York SIP contains separate commitments for Nassau and Westchester counties. See SIP § 3.6(B), (C).
 
 
 11
 Plaintiffs here attempt to use the citizen suit provision of the Act to enforce the City's commitment to mitigate CO emissions. That provision authorizes private citizens to bring an action in a district court to enforce "any condition or requirement under an applicable implementation plan relating to transportation control measures...." 42 U.S.C.A. § 7604(f)(3) (West Supp.1992).
 
 
 12
 B. The proposed development. The City acquired the project site in 1953 and sold its use and occupancy rights to the TBTA. In 1956, the TBTA built and has since operated on the site an office building and a convention center, the New York Coliseum. In the early 1980's, after the construction of the Jacob Javits Center rendered the Coliseum obsolete, the City sought proposals for the private purchase and redevelopment of the site. The TBTA was designated as the "lead agency" to carry out the required environmental studies under SEQRA, including the draft and final EIS.
 
 
 13
 After receiving a number of proposals, TBTA accepted Boston Properties' proposal. The agreement among the parties (the "New Purchase Agreement") provides that the NY IDA will be the owner of the commercial portion of the project and will issue non-tax exempt bonds to Coliseum Associates for financing. The gross purchase price of approximately $338 million will be applied toward capital and operating programs of the City's transit system.
 
 
 14
 Plaintiffs object to the project's failure to identify measures to mitigate a violation of the ambient CO standard in midtown Manhattan identified in the EIS for the proposed project. The relevant carbon monoxide standard provides that the ambient carbon monoxide concentration shall not exceed, more than once per year, a level of 9 parts per million ("ppm") over an 8-hour period. 40 C.F.R. § 50.8(a)(1) (1991). The ten sites monitored by the project's Final EIS are either adjacent to Columbus Circle, on major arteries serving Columbus Circle, or have been designated a "hot spot" by the SIP--i.e., a location with a potential to violate the carbon monoxide standard. Of these ten sites, the maximum permissible level of 9 ppm is currently exceeded at only one site, the East 59th Street "hot spot."[2] The Final EIS estimated that the carbon monoxide level at the East 59th Street "hot spot" between Madison and Fifth Avenues will reach 12.9 ppm in 1993 without the project and 13.3 ppm with the project. At eight of the other ten sampling sites, although the eight-hour CO concentrations are projected to increase, they are expected to remain below 9 ppm. At the remaining sampling site, the eight-hour CO concentration is projected to remain unaffected.
 
 
 15
 C. District Court opinion. On cross-motions for summary judgment, the Court granted relief to the plaintiffs on their Clean Air Act claim, but dismissed their pendent claims. Coalition Against Columbus Center v. City of New York, supra. The Court found a breach of the commitment in subsection 3.6(A) of the SIP to implement mitigation measures for violations of the NAAQS for carbon monoxide identified during a project's environmental review procedure. The Final EIS predicted that the project would marginally exacerbate an already existing violation of the NAAQS for carbon monoxide at the East 59th Street "hot spot." The Court properly recognized that due to EPA's conventions for rounding integers, 40 C.F.R. § 50.8(d) (1991), and the de minimis rule promulgated by the New York State Department of Environmental Conservation, the increase at the 59th Street "hot spot" was a non-legally cognizable increase, and that finding is not challenged on appeal. 769 F.Supp. at 484-85.
 
 
 16
 Nevertheless, the Court ruled that "new projects must mitigate existing carbon monoxide violations, even those carbon monoxide violations not of the project's own making." Id. at 485. The City contended that mitigation would be achieved by the City's area-wide air pollution control program entitled "Relief of Traffic Congestion and Air Pollution" ("ROTCAP"), now known as "Traffic Congestion and Pollution Relief Study" ("Traffic CPR"). Judge Kram criticized the delay in completing the Traffic CPR study and found that "in light of defendants' inability to supply the Court with any basis for a realistic timetable for development, proposal, adoption and implementation of ameliorative measures," the City had "failed to fulfill" subsection 3.6(A) of its SIP commitment. Id. at 489.
 
 
 17
 Upon the finding of a violation, the Court invoked its equitable powers to craft an appropriate remedy. Plaintiffs sought a declaration nullifying and voiding the New Purchase Agreement, as well as five resolutions of the Board of Estimate, two TBTA resolutions, and one NY IDA resolution approving, enabling, or financing the sale. Specifically, on their claim to enforce subsection 3.6(A), plaintiffs sought an injunction against the City from taking any steps in furtherance of the project until a revised EIS is prepared showing how carbon monoxide violations will be avoided.
 
 
 18
 The Court denied plaintiffs' request to enjoin the project until a revised Final EIS shows that the NAAQS violations identified therein will be mitigated and that compliance with the SIP will be achieved and maintained. Instead, after weighing the competing public interests, the Court enjoined the City from further violating its SIP commitment with respect to mitigation of the CO "hot spot" at East 59th Street and established penalties for future deficiencies. Id. at 490. If the City fails to complete the Traffic CPR Study in time to incorporate its recommendations into the revised SIP on November 15, 1992, it will be subject to an order enjoining any further work on the project. In addition, if the deadline for completion of traffic CPR is missed, the Court will impose a fine upon the defendants, jointly and severally, in the initial amount of at least $15 million, to be supplemented by additional fines until the defendants fully comply with their statutory obligations.
 
 Discussion
 I. Applicable Legal Standards
 
 19
 On appeal, the defendants raise the threshold issue whether a citizen suit may be maintained to enforce subsection 3.6(A) of the SIP. The citizen suit provision of the Clean Air Act creates a limited private right of action to enforce the Act's provisions and provides in pertinent part:
 
 
 20
 [A]ny person may commence a civil action on his own behalf--(1) against any person ... who is alleged to be in violation of (A) an emission standard or limitation under this chapter....
 
 
 21
 42 U.S.C. § 7604(a)(1). The Act defines an "emission standard or limitation" as:
 
 
 22
 (3) ... any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements ... which is in effect under this chapter.... or under an applicable implementation plan.
 
 
 23
 42 U.S.C.A. § 7604(f)(3) (West Supp.1992). To state a claim under the citizen suit provision a plaintiff must allege a violation of "a specific strategy or commitment in the SIP and describe, with some particularity, the respects in which compliance with the provision is deficient." Council of Commuter Organizations, 683 F.2d at 670; see Wilder II, 854 F.2d at 610; Action for Rational Transit v. West Side Highway Project, 699 F.2d 614, 616 (2d Cir.1983).
 
 
 24
 A cornerstone of this Court's interpretation of the citizen suit provision is the principle that an air quality standard established under the Clean Air Act is not an "emission standard or limitation." Wilder II, 854 F.2d at 613-16; see also League to Save Lake Tahoe, Inc. v. Trounday, 598 F.2d 1164, 1173 (9th Cir.), cert. denied, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979). In Wilder II, a tenant's association and various concerned citizens brought an action pursuant to the citizen suit provision to enjoin a development project in Manhattan. We found that plaintiffs's claim to enforce section 3.5.3 of the New York State SIP was simply an effort to enforce the NAAQS for carbon monoxide and therefore could not be maintained under section 7604 of the Act. Section 3.5.3 provides in pertinent part that "all [carbon monoxide] hot spots will be eliminated by the end of 1987." See Wilder II, 854 F.2d at 609. The plaintiffs argued that a "condition or requirement" of section 3.5.3 of the SIP was that all hot spots must be eliminated by December 31, 1987, and that construction of the project would "assure the continued existence of hot spots." See id. at 612.
 
 
 25
 Distinguishing between an air quality standard and a specific strategy to attain that standard, we rejected the argument that this claim alleged a violation of a condition or requirement "relating to transportation control measures" within the meaning of subsection 7604(f)(3). Id. at 614. The statement "that all hot spots will be eliminated by the end of 1987," we reasoned, merely restated the CAA's requirement that the NAAQS for carbon monoxide must be attained by December 31, 1987. Id. at 615. The question presented in the pending appeal is whether an action to enforce subsection 3.6(A) constitutes an effort to compel general compliance with an air quality standard or whether it is an effort to enforce a specific strategy to attain an air quality standard.
 
 
 26
 The two district courts that have considered the issue have held that subsection 3.6(A) of the SIP is sufficiently specific to be enforceable by a citizen suit. See Atlantic Terminal Urban Renewal Area Coalition v. N.Y.C. Dep't of Environmental Protection (ATURA I), 697 F.Supp. 157, 162-63 (S.D.N.Y.1988); Wilder v. Thomas (Wilder I), 659 F.Supp. 1500, 1506-07 (S.D.N.Y.1987), aff'd on other grounds, 854 F.2d 605 (2d Cir.1988), cert. denied, 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). Similar provisions in the 1982 Bay Area Quality Plan have also been held to be enforceable through citizen suits. Citizens for a Better Environment v. Deukmejian, 731 F.Supp. 1448, 1456-57 (N.D.Cal.1990) ("CBE I ") (stationary source and transportation contingency measures).
 
 
 27
 Wilder I ruled that subsection 3.6(A) was a "condition or requirement" of the SIP and therefore enforceable through a citizen suit under section 7604 of the Act. The District Court explained that to allege a legally sufficient claim to enforce subsection 3.6(A),
 
 
 28
 it would be necessary to allege a repudiation by the City of its commitment or a failure of the City to fulfill its commitment. Also, these allegations would need to be related to the specific items which can be the subject of a citizen suit under the Clean Air Act--i.e., transportation-control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements. The allegations would need to be made with particularity.
 
 
 29
 659 F.Supp. at 1507 (citations omitted). Although finding that subsection 3.6(A) could be enforced by a citizen suit, the District Court in Wilder I nevertheless dismissed the claim because the plaintiffs had not supported their allegation that the City had violated subsection 3.6(A) by repudiating or failing to fulfill its commitment. On appeal in Wilder II, we did not pass on the merits of the District Court's standard but affirmed on the ground of collateral estoppel. 854 F.2d at 621.
 
 
 30
 The issue was again raised before the District Court in ATURA I, which also upheld the use of a proper citizen suit to enforce subsection 3.6(A) of the SIP. The Court explained that subsection 3.6(A) "contains a commitment on the part of the City to act, and thereby does more than restate a goal." 697 F.Supp. at 162; see also CBE I, 731 F.Supp. at 1457 ("We discern no principled basis, consistent with the Clean Air Act, for disregarding this unequivocal commitment simply because the particulars of the contingency measures are not provided."). ATURA I also relied on the possibility that a contrary holding would allow states to "construct SIPs specific enough to satisfy the CAA requirements, with commitments to comply, but sufficiently general to thwart citizen suits." 697 F.Supp. at 162.
 
 
 31
 II. Enforcement of Subsection 3.6(A) in a Citizen Suit
 
 
 32
 We must decide whether subsection 3.6(A) of the SIP contains a "condition or requirement under an applicable implementation plan relating to transportation control measures," within the meaning of subsection 7604(f)(3). The initial question is whether subsection 3.6(A) contains a "condition or requirement under an applicable implementation plan." Wilder II held that the commitment in section 3.5.3 of the SIP to eliminate all hot spots by the then-statutory deadline of December 31, 1987, was not a "condition or requirement" of the SIP. Although subsection 3.6(A) commits the City to implement "mitigating measures," the SIP does not further specify the required types of mitigating measures. Thus, the commitment in subsection 3.6(A) is less specific than the transportation control measure identified in Wilder II (changing traffic flow patterns) and much less specific than a condition or requirement "relating to" that measure, such as the installation of a new traffic signal system. See Wilder II, 854 F.2d at 615-16.
 
 
 33
 Nevertheless, the commitment in subsection 3.6(A) is sufficiently specific to constitute a "condition or requirement under an applicable implementation plan," within the meaning of subsection 7604(f)(3). As ATURA I recognized, subsection 3.6(A) does not merely restate the NAAQS, it further "commits the City to take affirmative, although unspecified, steps to achieve the [national ambient air quality] standard." 697 F.Supp. at 161. Interpreting a similar provision in a California SIP, the Court in CBE I explained, "[T]he basic commitment to adopt and implement additional measures, should the identified conditions occur, constitutes a specific strategy, fully enforceable in a citizens action, although the exact contours of those measures are not spelled out." 731 F.Supp. at 1457. Moreover, "there is no reason why a process, plainly spelled out, can not constitute a valid, identifiable strategy for achieving Plan objectives." Id. Thus, subsection 3.6(A) sets forth a "condition or requirement" of the New York State SIP, though the lack of detail in the subsection makes it relatively easy to defeat a citizen suit alleging noncompliance.
 
 
 34
 The next question is whether the "condition or requirement" contained in subsection 3.6(A) relates to a transportation control measure within the meaning of subsection 7604(f)(3). The EPA has defined a transportation control measure as "any measure that is directed toward reducing emissions of air pollutants from transportation sources." Wilder II, 854 F.2d at 614 (quoting 40 C.F.R. § 51.100(r) (1987)). We have provided a similar definition. See Council of Commuter Organizations v. Metropolitan Transportation Authority, 683 F.2d 663, 666 n. 2 (2d Cir.1982) (" 'Transportation control measures' are strategies designed to reduce pollution by limiting or controlling motor vehicle use.") The defendants cite the City's Traffic CPR program as the mitigation strategy required by subsection 3.6(A). The program is an effort to identify and implement measures to reduce tail pipe emissions and relieve traffic congestion in the New York metropolitan area. Because CO emissions result primarily from gasoline powered motor vehicles, not surprisingly, Traffic CPR fits easily within the meaning of "transportation control measures."
 
 
 35
 In sum, the commitment in subsection 3.6(A) provides "an emission standard or limitation" within the meaning of the citizen suit provision because it states a "condition or requirement under an applicable implementation plan relating to transportation control measures." Since the citizen suit provision supports an action to enforce subsection 3.6(A) of the SIP, we must next consider whether the City has "repudiated" or "failed to fulfill" its commitment under the SIP, Wilder I, 659 F.Supp. at 1507, bearing in mind the fairly generalized nature of the commitment.
 
 III. SIP Compliance
 
 36
 As the District Court found, the proposed project's Final EIS relies on the Traffic CPR program to mitigate CO emissions. 769 F.Supp. at 485. Subsequent to the 1990 amendments to the CAA, the EPA required New York State to submit a revised SIP by November 15, 1992. Even with this apparent de facto extension, the District Court ruled that the existing commitment to meet the NAAQS for carbon monoxide by December 31, 1987, remained in effect until the EPA approves New York State's revised SIP. Id. at 486-87. In so holding, the Court relied on the so-called savings clause of the 1990 amendments, which preserved "[a]ny provision of any applicable implementation plan" until revision of the provision is approved or promulgated by the EPA, 42 U.S.C.A. § 7410(n)(1) (West Supp.1992), and on the fact that New York State has missed each of its previous deadlines for submitting revised SIP's. Id. at 487.
 
 
 37
 In determining the reasonableness of the City's efforts to meet its commitment under subsection 3.6(A), the District Court assessed the City's progress in meeting the December 31, 1987, deadline rather than according the City the benefit of the extension afforded by the 1990 amendments. The Court found that non-complying regions are not excused from complying with their obligations under the Act while they submit and await approval of their revised SIP's. Id. The Court found that the City was not entitled to the presumption that it would meet the revised deadlines in light of its history of missed deadlines. Id. Since the City had missed the December 1987 deadline contained in subsection 3.6(A), the Court assessed the City's progress according to the more stringent requirement applicable to areas that have failed to meet their SIP deadlines. Id. Because the City missed the then-applicable deadline, it must take steps that are reasonably calculated to reach the NAAQS "as soon as possible" rather than "as expeditiously as practicable." See Delaney v. EPA, 898 F.2d 687, 691 (9th Cir.) ("We believe that the only reasonable interpretation of the 1977 amendments is that if the 1982 deadline that congress specified is not met, the national ambient air quality standards must be attained as soon as possible with every available control measure, including those that the EPA identified in its criteria for approving 1982 plans"), cert. denied, --- U.S. ----, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990).
 
 
 38
 After assessing the City's efforts under the Traffic CPR study, the Court concluded that the City "failed to fulfill" subsection 3.6(A) of its SIP commitment because its reliance on the Traffic CPR program "does not represent a reasonable attempt to attain air quality standards at any time in the near future." 769 F.Supp. at 489. In reviewing this key conclusion, we consider first the applicable CO deadline and then the claim of noncompliance.
 
 
 39
 A. Applicable CO deadline. The initial inquiry is whether the 1990 amendments to the CAA extended the deadline for attainment found in subsection 3.6(A) of the current SIP. The 1990 amendments extended the City's deadline for attainment of the carbon monoxide NAAQS under a revised SIP from December 31, 1987, to December 31, 1995, and possibly to December 31, 2000. Meanwhile, New York operates under the current SIP until the EPA approves a revised SIP, due in November 1992. The current SIP commits the City to take mitigating measures under certain circumstances "so as to provide for attainment of the [national ambient air quality] standard by December 31, 1987 and maintenance of it thereafter." SIP § 3.6(A) (emphasis added).
 
 
 40
 The State and the City clearly have a continuing obligation to meet the specific requirements of the current SIP until the EPA approves a revised version pursuant to the 1990 amendments. In passing the 1990 amendments, Congress preserved "[a]ny provision of any applicable implementation plan" that was approved or promulgated by the Administrator prior to the passage of the amendments, 42 U.S.C.A. § 7410(n)(1) (West Supp.1992). Although subsection 3.6(A) is clearly a "provision" in an applicable SIP and therefore arguably preserved in its entirety, we must endeavor to give statutes "a harmonious, comprehensive meaning." United States v. Stauffer Chemical Co., 684 F.2d 1174, 1184 (6th Cir.1982), aff'd, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). Congress clearly intended to extend the deadline for compliance with the NAAQS. We cannot subscribe to the theory that Congress extended the deadline for compliance with the NAAQS, but obliged the states to remain liable for failure to meet the prior deadlines. The extension did not automatically effect a postponement of the deadlines for accomplishing all the specific tasks that a state obligated itself to perform in a SIP. A SIP commitment to shut down a particular source of pollution or to install a particular pollution control device by a specified date would not be extended by force of the 1990 amendments alone. But the subsection 3.6(A) commitment to take mitigating steps to eliminate hot spots is of a higher level of generality. Indeed, its very generality is what underlies the defendants' argument that the subsection is so similar to the obligation to meet the NAAQS as to render it unenforceable by a citizen suit.
 
 
 41
 We acknowledge the tension between interpreting the 1990 amendments to extend the subsection 3.6(A) deadline and at the same time interpreting the citizen suit provision to be applicable to the subsection 3.6(A) obligation. But we think that both interpretations carry out evident congressional objectives. Congress wanted to accord the states more time to meet the general obligations of SIPs. Yet Congress wanted citizens to be able to sue to enforce all SIP obligations relating to an emission standard or limitation, save only those that are, as we ruled in Wilder II, in effect an obligation to enforce the NAAQS. We believe that we faithfully effectuate congressional intent by recognizing that the deadline for attainment, set forth in subsection 3.6(A), has been extended and that the citizen suit provision remains available to enforce that subsection's somewhat general obligation "to assure that mitigating measures will be implemented ... so as to provide for attainment" by the extended date. The SIP commitment concerns attainment, but, unlike the commitment in Wilder II, which was the equivalent of a commitment to achieve attainment, the commitment here is a step toward attainment, and it is important that the taking of that step--the implementation of mitigating measures--be enforceable by a citizen suit.
 
 
 42
 Nonattainment areas such as New York face the additional proscription against the modification of any "control requirement in effect, or required to be adopted" by a prior order, settlement agreement, or plan "unless the modification insures equivalent or greater emission reductions of such air pollutant." 42 U.S.C.A. § 7515 (West Supp.1992).[3] While not defined in the 1990 amendments, the phrase "control requirement" bears a close resemblance to the phrase "emission standard or limitation" contained in the citizen suit provision, 42 U.S.C. § 7604(a)(1).[4] The resemblance is even more striking because an "emission standard or limitation" includes "any condition or requirement under an applicable implementation plan relating to transportation control measures," 42 U.S.C.A. § 7604(f)(3) (emphasis added). We would be making an untenable distinction if we were to hold that subsection 3.6(A) is an "emission standard or limitation" for purposes of the citizen suit provision, but not a "control requirement" within the meaning of the general savings clause. We decline to do so. Without defining the outer limits of "control requirement" in section 7515, we hold that the commitment to implement mitigating measures, but not the attainment date, constitutes a "control requirement" and therefore remains a continuing obligation of New York State.
 
 
 43
 While Congress intended the new deadlines to apply to commitments such as that found in subsection 3.6(A), New York might have intended to impose upon itself a stricter compliance deadline. The December 31, 1987, deadline in subsection 3.6(A) may have been a state law obligation that simply coincides with the federally mandated deadline. While states retain the authority to implement a deadline for attainment more stringent than the federally required standard, see 42 U.S.C.A. §§ 7502(a)(2)(A), (B) (requiring nonattainment areas to achieve NAAQS "as expeditiously as practicable" or by certain date); 42 U.S.C. § 7416 (with exceptions not relevant here, states may adopt measures so long as they are not "less stringent than the standard or limitation under such plan or section"), they must clearly state their intention to impose a stricter deadline for attainment of the NAAQS. Unless otherwise clearly provided in the SIP, we presume that a state relying on an attainment deadline that coincides with the federally mandated deadline does not intend to impose a more stringent deadline based independently on state law.
 
 
 44
 Because the CAA amendments of 1990 extended the deadline found in subsection 3.6(A) of the SIP, the City has not missed the deadline for assuring that mitigating measures will be implemented. As a result, the District Court erred in determining whether the City's efforts were "reasonably calculated to lead to NAAQS compliance 'as soon as possible.' " 769 F.Supp. at 487. The relevant inquiry is whether the efforts would lead to compliance "as expeditiously as practicable" or by the statutory deadline. When measured against the more flexible standard, the City's efforts do not constitute a "failure ... to fulfill" or a "repudiation" of its commitment. Wilder I, 659 F.Supp. at 1507.
 
 
 45
 B. SIP compliance with CO deadline. As the defendants concede, the City must assure that either the project sponsor or the City will implement mitigating measures for any violation or exacerbation identified by a project's EIS, even if not caused by the project.[5] While non-project caused violations or exacerbations must be mitigated, subsection 3.6(A) does not specify whether the City or the project sponsor must implement these measures. The City simply must assure that either the City or the project sponsor must so mitigate.[6] The City could require the project sponsor to mitigate any project-caused violations or exacerbations, while implementing measures to deal with non-project caused violations or exacerbations. Because the proposed project did not cause the violation or exacerbation identified in the Final EIS, the City has the obligation to mitigate the East 59th Street "hot spot."
 
 
 46
 The centerpiece of the City's effort to implement an area-wide strategy to attain and maintain the federally mandated air quality standards is the Traffic CPR study. The study is under development by a private consulting firm working under the jurisdiction of the New York City Department of Transportation. The study will suggest strategies to be incorporated into the revised SIP due November 1992 by the 1990 amendments to the Clean Air Act. As of December 1990, the City had budgeted more than $2,756,000 for the consultant. Part A of the study will consist of data collection and computer modelling of traffic patterns and emissions scenarios. Field data will be used to create and then calibrate a computer traffic modelling program. Part B will consist of the presentation of specific pollution control and traffic congestion measures based on the program's estimation of the effectiveness of various combinations of such measures.
 
 
 47
 While the data collection has been completed, the Court noted that implementation of Traffic CPR lags behind schedule. See 769 F.Supp. at 488-89. Traffic CPR is currently scheduled for completion in late 1992, in order to recommend strategies for the November 1992 SIP. However, because the computer program to analyze and interpret the data had not yet been completed as of June 28, 1991, the City's Department of Transportation was unable to provide the District Court with a summary of the data "because it exists as thousands of pages and computer disks of raw statistics."
 
 
 48
 Though the City's progress has not been as rapid as possible, the plaintiffs have not presented a triable issue of fact as to SIP compliance. The City certainly has not repudiated or failed to fulfill its commitment to mitigate nonproject-caused violations or exacerbations. See Wilder I, 659 F.Supp. at 1507. No evidence suggests that the City's efforts are not made in good faith. The City has not made any statements or taken any acts to suggest that it does not intend to comply with its commitment.
 
 
 49
 The Traffic CPR study is scheduled to be completed some three years before the new attainment deadline of 1995. In Atlantic Terminal Urban Renewal Area Coalition v. N.Y.C. Dep't of Environmental Protection, 740 F.Supp. 989, 998 (S.D.N.Y.1990) ("ATURA II "), the Court held that defendants had not failed to fulfill their commitment under § 3.6(A). Although the ATURA II defendants were required to take steps to achieve the NAAQS "as soon as possible," the Court found the area-wide plan a reasonable attempt although not completed until one year prior to the deadline, id. at 997. By contrast, the Traffic CPR study is scheduled to be completed some three years before the new attainment deadline of 1995. While the City has not implemented any area-wide mitigating measures, it would be premature to implement a strategy without an understanding of its system-wide effect. The steps that the City has taken to plan and prepare for the implementation of mitigating measures are indisputably sufficient to defeat a claim of current noncompliance with subsection 3.6(A). Whether in the future the City will become liable to a citizen suit for noncompliance for failure to implement steps reasonably calculated to achieve the extended attainment deadlines will depend on the subsequent actions or inaction of the City.
 
 Conclusion
 
 50
 The City has not now repudiated or failed to fulfill its commitment to assure that mitigating measures are implemented to reach compliance by the new statutory deadline. Therefore, we reverse the portion of the judgment granting summary judgment for the plaintiffs on their citizen suit action to enforce subsection 3.6(A), and direct the entry of summary judgment on the claim for the defendants. As to the pendent claims raised on the cross-appeal, we affirm for the reasons set forth in the District Court's opinion. 769 F.Supp. at 491-98. Accordingly, the judgment is reversed in part and affirmed in part, and remanded for entry of a judgment consistent with this opinion.
 
 
 
 [1]
 The Final EIS predicts that 4,790 new auto, taxi, and truck trips will be generated each day; eighty-five percent of the auto trips will park in the project garage, resulting in "increased carbon monoxide concentrations."
 
 
 [2]
 To understand the relationship between the "hot spot" and the proposed project, some awareness of Manhattan geography is helpful. The currently high CO concentrations at the 59th Street "hot spot" result primarily from the traffic congestion around the Manhattan side of the 59th Street Bridge spanning the East River. East 59th Street becomes Central Park South west of 5th Avenue and eventually enters Columbus Circle as West 59th Street
 
 
 [3]
 The relationship between the savings clauses in subsection 7410(n)(1) and section 7515 is not entirely clear. While section 7515 is entitled "General savings clause," it is located within Part D. The portion of section 7515 that preserves EPA regulations issued or promulgated "under this chapter" prior to the 1990 amendments clearly applies outside the confines of Part D. By contrast, the portion of section 7515 preserving any "control requirement" does not state whether it applies only to Part D or to the Clean Air Act in its entirety
 Subsection 7410(n)(1) preserves "[a]ny provision of any applicable implementation plan" approved or promulgated prior to the 1990 amendments. For nonattainment areas, section 7515 also preserves any "control requirements" required by order or settlement agreements as well as those required by SIP's. However, with respect to "control requirements" in SIP's, it is unclear whether section 7515 preserves anything in addition to that already preserved by the savings clause in subsection 7410(n)(1).
 In any event, under both savings clauses, the statutory extension does not relieve the states of meeting all deadlines in current SIP's. Thus, for example, the statutory extension would not relieve the City of its commitment to close a particular smokestack by December 31, 1987. Thus, both savings provisions would require the City to close the smokestack "as soon as possible."
 
 
 [4]
 By focusing on the specificity of the requirement, preliminary efforts to define the phrase "control requirement" have been similar to the current definition of "emission standard or limitation." For example, in a proposed rule, the EPA interpreted the phrase "control requirement" to mean "a discrete regulation directed at a source of pollution." 56 Fed.Reg. 826 (1991) (proposed Jan. 9, 1991)
 Similarly, the savings clause has been held not to preserve the requirement that EPA prepare a Federal Implementation Plan in lieu of a rejected SIP because "there is no present specification of the details of control of various sources of emission control." Coalition for Clean Air v. EPA, 762 F.Supp. 1399, 1402 (C.D.Cal.1991); accord 56 Fed.Reg. 826 (1991) (proposed Jan. 9, 1991) (42 U.S.C.A. § 7515 does not preserve obligation to promulgate Federal Implementation Plan).
 
 
 [5]
 If a project EIS "identifies a violation or exacerbation of the carbon monoxide standard," then the City commits to assure that the "project sponsor or City" implement mitigating measures. SIP § 3.6(A) (emphasis added). By contrast, Nassau and Westchester Counties commit to mitigate only project-caused violations. Id. § 3.6(B), (C)
 
 
 [6]
 The EPA notice relied upon by the District Court and the plaintiffs, 53 Fed.Reg. 35,207 (1988) (proposed Sept. 12, 1988), is not to the contrary. See 769 F.Supp. at 485. In its notice, the EPA stated, "The SIP commitment does not make this distinction between project-caused and nonproject-caused CO violations." Therefore, the EPA explained, RFP reports must identify all CO violations, whether project caused or not
 The EPA took no position, however, as to whether the City or the project sponsor must implement the mitigating measures.