Samuel N. CATE, et al., Plaintiffs,

v.

TRANSCONTINENTAL GAS PIPE
LINE CORP., Defendant.

Civ. A. No. 95–0014–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Oct. 13, 1995.

Gail Starling Marshall, Rapidan, VA, and James M. Hecker, Trial Lawyers for Public Justice, P.C., Washington, DC, for plaintiffs.

George H. Gromel, Jr. and Cassandra Carol Collins, Hunton & Williams, Richmond, VA, for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

The court referred this case to the Honorable B. Waugh Crigler, United States Magistrate Judge, pursuant to a standing order, for proposed findings of fact and a recommended disposition. The Magistrate Judge filed a Report and Recommendation on July 21, 1995, recommending that the court grant in part the defendant's March 13, 1995 motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6). Specifically, the Magistrate Judge recommended that the court dismiss Counts One, Two and Three of the complaint, but deny the defendant's motion as to Count Four. The plaintiffs filed Objections to the Magistrate's Report pursu-

ant to Fed.R.Civ.P. 72(b). In considering the plaintiffs' Objections, this court is required to undertake a *de novo* review of the record in this case. *Orpiano v. Johnson*, 687 F.2d 44, 47–8 (4th Cir.1982). Upon review of the record, the court adopts the recommendation of the Magistrate Judge for the reasons stated herein. Accordingly, the court grants the defendant's motion to dismiss as to the first three counts, but denies the motion as to the fourth count.

## I.

Plaintiffs are citizens of Virginia and property owners in Orange County, Virginia. Defendant Transcontinental Gas Pipe Line Corp. ("TGPL"), a Delaware corporation with its principal place of business in Houston, Texas, owns and operates five natural gas pipe line compressor stations in Virginia, including one in Unionville that is adjacent to plaintiffs' property. These facilities emit, among other pollutants, nitrogen dioxide ("$NO_2$"), one of six pollutants regulated under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*

Plaintiffs have brought suit against TGPL claiming that the emissions from the Unionville facility violate both the federal Clean Air Act and Virginia state law. Specifically, the complaint alleges that the emissions from the Unionville facility continuously violate (1) a state Order issued for the purpose of bringing TGPL into compliance with federal clean air standards (Count One); (2) the National Ambient Air Quality Standards for $NO_2$ promulgated under the Clean Air Act (Count Two); and (3) the Virginia "odor rule" which, plaintiffs maintain, is federally enforceable under the Clean Air Act (Count Three). Finally, plaintiffs allege that the emissions constitute a nuisance under Virginia law (Count Four).

Plaintiffs seek to enjoin TGPL to comply with the state Order, the NAAQS and the odor rule. Plaintiffs also seek to have the court enjoin further pollution, odor and noise at the Unionville facility and order abatement. Finally, plaintiffs seek civil penalties, compensatory and punitive damages, and attorneys' fees and costs.

Plaintiffs maintain that the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604, furnishes them with standing to bring the first three claims in federal court. Plaintiffs assert that the court may exercise both diversity jurisdiction, 28 U.S.C. § 1332, and supplemental jurisdiction, 28 U.S.C. § 1367, over the fourth, state-law claim.

TGPL has filed a motion to dismiss all the claims on the grounds that (1) neither the state Order, the NAAQS, nor the state odor rule are enforceable under the Clean Air Act; and (2) the state nuisance claim does not adequately plead jurisdiction and is, in any event, time-barred.

## II.

The basic framework of the Clean Air Act ("the Act") is relatively straight-forward. The Act requires the Environmental Protection Agency ("EPA") to establish National Ambient Air Quality Standards ("NAAQS") for pollutants harmful to the public health and welfare. To date, EPA has set NAAQS for six pollutants, including $NO_2$. Each state is required to submit to EPA, for its approval, a State Implementation Plan ("SIP") detailing how the state expects to achieve the NAAQS for each pollutant. Thus, the purpose of the SIP is to provide for the implementation, maintenance, and enforcement of the NAAQS, 42 U.S.C. § 7410(a)(1), in each of the state's air quality control regions, 42 U.S.C. § 7407.

The Act contains a provision authorizing so-called "citizen suits" to remedy specific violations of the Act. 42 U.S.C. § 7604. It is this provision which is at the heart of this dispute. The provision provides that a suit may be brought against any person who is alleged to be in violation of:

(A) an emission standard or limitation under this chapter or (B) an order issued by the [EPA] Administrator or a State with respect to such a standard or limitation.

42 U.S.C. § 7604(a)(1).

"Emission standard or limitation under this chapter" is defined at § 7604(f)(1) as:

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,

\* \* \* \* \* \*

(4) any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations which is in effect under this chapter ... or under an applicable implementation plan.

42 U.S.C. § 7604(f).

Thus, for a given requirement to be enforceable under § 7604, it must (1) fit within one of the definitions of an "emission standard or limitation" under § 7604(f), and (2) be "in effect under" the Act. The primary issue before the court is whether the requirements outlined in the first three counts of the complaint (that is, the state Order, the NAAQS, and the odor rule) are enforceable under § 7604. If they are not, then Count Four must adequately plead diversity jurisdiction for the court to entertain that claim alone. The court addresses each of the Counts separately below.

### III.

#### A.

Count One alleges that the Unionville facility continuously violates a state Order to enforce emission control requirements under the Act. The state Order to which the complaint refers is an Agreement[1] entered into between the Virginia Department of Air Pollution Control ("the Department") and TGPL.

In 1991, the Department found that high concentrations of $NO_2$ emitted from the Unionville facility "cause[ ] or contribute[ ] to an exceedance of the National Ambient Air Quality Standard for nitrogen dioxide." *Agreement* at p. 5. In addition, the Department found that the $NO_2$ emissions caused the Unionville facility to violate Virginia's "odor rule."[2] As a result of these findings, the Department entered into an Agreement ("the Agreement") with TGPL.

The Agreement provides in pertinent part:

1. TGPL shall review and analyze possible alternatives to reduce emissions, or other appropriate means to eliminate the modeled exceedance of the National Ambient Air Quality Standard for nitrogen dioxide. The analysis shall include all actions that may be proposed at the facility; this may include but is not limited to: add on control devices to be installed, modifications to existing equipment, changes in methods or hours of operation, changes in release parameters of pollutants emitted, or any combination of such measures. The analysis shall also include modeling to verify that the proposed corrective actions will in fact result in reductions in ambient concentrations of $NO_2$ sufficient to eliminate the modeled exceedance of the NAAQS.

2. The analysis specified above shall also include a detailed plan specifying milestone dates by which the corrective actions proposed will be achieved.

\* \* \* \* \* \*

4. Once the plan and the modeling analysis specified in this Agreement have been reviewed by the Department, a new agreement shall be developed. This new agreement shall incorporate the plan of corrective actions; it shall establish milestones that are to be met to ensure that the measures are taken in an expeditious manner.

5. The agreement called for in paragraph 4 of this Section will most likely result in a source specific change to the State Imple-

---

1. The Agreement is found at exhibit C of plaintiffs' complaint.

2. The Virginia "odor rule," enacted pursuant to Title 10.1 of the Virginia Code provides as follows:

No owner or other person shall cause or permit to be discharged into the atmosphere from any affected facility any emissions which cause an odor objectionable to individuals of ordinary sensibility.

Virginia State Air Pollution Control Board, Regulations for the Control and Abatement of Air Pollution, VR § 120–04–0203.

mentation Plan (SIP); as such it will be subject to a public comment period, with a public hearing. Once the public comment period and public hearing have been completed, a source specific SIP revision shall be submitted to the U.S. Environmental Protection Agency for its comments and approval.

*Agreement* at 6.

The Agreement contains an enforcement provision that authorizes the Department to levy civil fines against TGPL should it fail to submit its modeling and subsequent plan to the Department. *See Agreement* at 7.

Count One alleges that TGPL has not complied with the terms of this Agreement. Specifically, plaintiffs allege that TGPL has yet to submit a modeling protocol that is acceptable to the Department. Consequently, TGPL has not submitted a plan for abatement. *Complaint* ¶ 19.

The court must determine whether the Agreement is enforceable under the citizen suit provision of the Clean Air Act. As noted above, for a given requirement to be enforceable under § 7604, it must (1) fit within one of the definitions of an "emission standard or limitation" under § 7604(f), and (2) be "in effect under" the Act. 42 U.S.C. §§ 7604(a)(1)(A), (f).[3] The court holds that the Agreement fits within one of the definitions of "emission standard or limitation" in that it creates a "schedule or timetable of compliance." 42 U.S.C. § 7604(f)(1). However, the court also concludes that the Agreement is not "in effect under" the Act. Thus, the Agreement is not enforceable under the citizen suit provision.

### 1.

■ The court concludes that the Agreement satisfies the threshold definition of an emission standard. Section 7604(f)(1) defines "emission standard or limitation under this chapter" as

a schedule or timetable of compliance, emission limitation, standard of performance or emission standard.[4]

Section 7602(p) in turn defines "schedule and timetable of compliance" as

a schedule of required measures including an enforceable sequence of actions or operations *leading to compliance with an emission limitation, other limitation, prohibition, or standard* (emphasis supplied).

Plaintiffs contend that the Agreement fits within the citizen suit provision because it clearly establishes a "schedule or timetable of compliance" which is, by definition, an "emission standard or limitation." 42 U.S.C. § 7604(f)(1).

TGPL, in response, contends that the compliance schedule created by the Agreement is not an "emission standard or limitation" because it relates to the enforcement of the NAAQS which, the overwhelming weight of case law holds, are themselves not "emission standards or limitations." Thus, TGPL contends, the schedule established by the Agreement is not the technical "schedule or timetable of compliance" defined in the statute because the schedule contained in the Agreement has, as its ends, compliance with the NAAQS, not compliance with an "emission standard or limitation."

The court disagrees. It is well-established that the NAAQS are not an "emission standard or limitation" as defined by the Act. *See Coalition Against Columbus Ctr. v. New York,* 967 F.2d 764, 769 (2d Cir.1992) ("A cornerstone of this Court's interpretation of the citizen suit provision is the principle that an air quality standard established under the Clean Air Act is not an 'emission standard or

---

**3.** Moreover, if such a requirement is part of an EPA or state Order, it is enforceable pursuant to § 7604(a)(1)(B). The Magistrate Judge held that the Agreement is not an "Order" as that term is properly construed because "the word 'order' never appears in the documents exchanged between [the Department] and TGPL." *Report & Recommendation* at 4. Thus, the Magistrate Judge recommended that the court dismiss Count One because jurisdiction does not lie under § 7604(a)(1)(B). While the court is inclined to agree with the Magistrate Judge's conclusion

that the Agreement is not an Order, it believes it appropriate to consider further the consequences of the pleadings. Thus, the court holds that even if the Agreement is an "Order," it is not enforceable under either §§ 7604(a)(1)(A) or (B) because it is not "in effect under" the Act.

**4.** The additional requirement of § 7604(f)(1) that an emission standard or limitation be "in effect under" the Act is discussed at subsection 2, *infra.*

limitation'"); *Accord Atlantic Terminal Urban Renewal Area Coalition v. New York City Dept. of Envtl. Protection,* 697 F.Supp. 157, 161 (S.D.N.Y.); *Citizens for a Better Environment v. Deukmejian,* 731 F.Supp. 1448 (N.D.Cal.1990), *modified,* 746 F.Supp. 976 (N.D.Cal.1990); *League to Save Lake Tahoe, Inc. v. Trounday,* 427 F.Supp. 1350 (D.Nev.1977), *aff'd* 598 F.2d 1164, 1173 (9th Cir.1979), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979). Thus, suits to force compliance with the NAAQS are not allowed under § 7604.[5] However, the claim raised under Count One does not seek to enforce the NAAQS directly. Rather, it seeks to enforce requirements established as a mechanism to enforce the NAAQS. Courts have recognized the importance of this distinction for purposes of enforcement under § 7604.

For example, in *Coalition Against Columbus Center v. City of New York,* 967 F.2d 764 (2d Cir.1992), the court held that it had jurisdiction over a suit brought under § 7604 to enforce a provision of the New York SIP even though the provision in question related rather directly to attaining the NAAQS for carbon monoxide. The provision of the SIP at issue in that case provided as follows:

> To further ensure that the carbon monoxide standard is attained in New York City, if an [Environmental Impact Statement] for a project proposal identifies a violation or exacerbation of the carbon monoxide standard, then the City commits to assure that mitigating measures will be implemented by the project sponsor or City, so as to provide for attainment of the standard by December 31, 1987 and maintenance of it thereafter.

*Id.* at 767. The court characterized the issue before it as "whether an action to enforce [this SIP provision] constitutes an effort to compel general compliance with an air quality standard or whether it is an effort to enforce a specific strategy to attain an air quality standard." *Id.* at 770.[6]

In holding that the provision was enforceable under § 7604 because it was not directed at general compliance with the NAAQS, the court distinguished the SIP provision before it from the SIP provision held to be unenforceable in *Wilder v. Thomas,* 854 F.2d 605 (2d Cir.1988), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). The provision at issue in *Wilder* provided that "all [carbon monoxide] hot spots will be eliminated by the end of 1987." *See Wilder,* 854 F.2d at 609. The *Columbus Center* court, in distinguishing *Wilder,* noted that the claim to enforce the hot spot provision "was simply an effort to enforce the NAAQS for carbon monoxide and therefore could not be maintained under section 7604 of the Act." *Coalition Against Columbus Center,* 967 F.2d at 770. Moreover, "[t]he statement 'that all hot spots will be eliminated by the end of 1987' ... merely restated the [Act's] requirement that the NAAQS for carbon monoxide must be attained by December 31, 1987." *Id.*

In contrast, the court concluded that the SIP provision at stake in *Columbus Center* "does not merely restate the NAAQS, it further 'commits the city to take affirmative, although unspecified, steps to achieve the [national ambient air quality] standard.'" *Id.* (quoting *Atlantic Terminal Urban Renewal Area Coalition v. N.Y.C. Dep't of Environmental Protection,* 697 F.Supp. 157, 161 (S.D.N.Y.1988)). The court acknowledged that "[a]lthough [the provision] commits the City to implement 'mitigating measures,' the SIP does not further specify the required types of mitigating measures." *Id.* at 771. However, the court reasoned that "'the basic commitment to adopt and implement additional measures, should the identified conditions occur, constitutes a specific strategy, fully enforceable in a citizens action, although the exact contours of those measures are not

---

5. *See* discussion of Count Two at III.B., *infra.*

6. Note that the court in *Coalition Against Columbus Center,* in analyzing whether or not the SIP provision was an "emission standard or limitation," was ostensibly working within § 7604(f)(3), not § 7604(f)(1) as is this court. The court does not consider this distinction important for purposes of analysis. The issue in the case was whether a provision designed to enforce the NAAQS was an "emission standard or limitation." Whether that provision is additionally characterized as a "condition or requirement" of a SIP under § 7604(f)(3) or a "schedule of compliance" under § 7604(f)(1) is of no moment.

spelled out.' Moreover, 'there is no reason why a process, plainly spelled out, can not constitute a valid, identifiable strategy for achieving Plan objectives.'" *Id.* (quoting *Citizens for a Better Environment v. Deukmejian*, 731 F.Supp 1448, 1457 (N.D.Cal.1990)).

Thus, the *Columbus Center* court held that the SIP provision at issue was enforceable under § 7604 despite the fact that it related somewhat directly to achieving the NAAQS and, moreover, did not specify the steps required to bring the City into compliance with the NAAQS. The court reached its conclusion by distinguishing actions brought to enforce the NAAQS from actions brought to enforce requirements that, in turn, seek to achieve the NAAQS. The court held that the provision at issue was properly characterized as the latter, and was, therefore, enforceable under § 7604.

The claim under Count One is also properly characterized as an action to enforce requirements that seek to achieve the NAAQS, rather than as an action to enforce the NAAQS themselves. In addition to committing both parties to a general course of action, the Agreement outlines specific steps that the Department, together with TGPL, must take in an effort to bring the facility into compliance with the Act. Specifically, the Agreement requires TGPL to review and analyze, through the use of computer modeling, various alternatives to reduce emissions. *Agreement* at 6. Indeed, the Agreement contains a list of potential options that TGPL may consider. *Id.* In addition, TGPL is required to submit a detailed plan that specifies milestone dates for implementation of the corrective actions chosen by TGPL. *Id.* The Department is required to review the plan submitted by TGPL and to issue a plan of its own incorporating TGPL's plan and establishing administrative milestone dates for the purpose of expediting TGPL's compliance with its plan. *Id.* The Department is

then likely to institute a change to the Virginia SIP to account for the Agreement. *Id.* Finally, the Agreement contains several penalty provisions should TGPL fail to comply with its terms. *Id.* at 7.

Thus, even more so than the SIP provision at issue in *Coalition Against Columbus Center*, the Agreement here contains a list of specific steps that both TGPL and the Department must take to comply with its terms. Thus, the Agreement does not simply "restate[ ] the [Act's] requirement that the NAAQS ... must be attained." *Coalition Against Columbus Ctr.*, 967 F.2d at 770. Rather, it contains a "valid, identifiable strategy" for achieving its ends. *Id.* at 771. Accordingly, the schedule created under the Agreement is designed to lead to compliance not with the NAAQS themselves, but with requirements established as a mechanism for achieving the NAAQS.[7]

In short, the court concludes that the Agreement creates a "schedule or timetable of compliance" because the schedule established under the Agreement has as its ends, compliance with "an emission limitation, other limitation, prohibition, or standard", 42 U.S.C. § 7602(p), and not compliance with the NAAQS themselves. Thus, the Agreement satisfies the threshold definition of an "emission standard or limitation" under § 7604(a)(1)(A).

2.

■ In order to qualify as an enforceable "emission standard or limitation under this chapter," 42 U.S.C. § 7604(a)(1), a given requirement, such as the schedule of compliance at issue in this case, must also be "in effect under this chapter ... or under an applicable implementation plan." 42 U.S.C. § 7604(f). It seems clear that the schedule of compliance is not in effect under an applicable implementation plan. After all, it is not included in Virginia's SIP. Thus, to be enforceable under the citizen suit provision,

---

7. In the language of the statute, the schedule of compliance "lead[s] to compliance with an emission limitation." 42 U.S.C. § 7602(p). "Emission limitation" is defined generally at § 7602(k) as:

a requirement established by the State ... which limits the quantity, rate, or concentra-

tion of emissions of air pollutants on a continuous basis, *including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment work practice or operational standard promulgated under this chapter.*

42 U.S.C. § 7602(k) (emphasis supplied).

the schedule of compliance must be "in effect under" the Act. What it means to be "in effect under" the Act is disputed by the parties.

There appears to be considerable support for the proposition that the language "in effect under this chapter" limits the citizen suit provision "to suits against individual polluters or government actors that fail to comply with the specific requirements of a state or EPA implementation plan...." *Conservation Law Found. v. Fed. Highway Admin.,* 24 F.3d 1465 (1st Cir.1994) (citing *Wilder v. Thomas,* 854 F.2d 605, 613–15 (2d Cir.1988), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989); *League to Save Lake Tahoe, Inc. v. Trounday,* 598 F.2d 1164, 1173 (9th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979); *Citizens Ass'n of Georgetown Committee of 100 v. Washington,* 535 F.2d 1318, 1322 (D.C.Cir.1976); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 700 (D.C.Cir.1974); *Council of Commuter Orgs. v. Metro. Transp. Auth.,* 683 F.2d 663, 670–71 (2d Cir.1982)). Thus, for many courts, approval by EPA or inclusion in a state SIP are the outer boundaries of the meaning of "in effect under" the Act. Given that the Agreement here has not been approved by EPA (and, of course, it is not included in Virginia's SIP), it is clear that under the rationale of the cited cases, the Agreement is not "in effect under" the Act.

Plaintiffs, however, contend that the compliance schedule is "in effect under" the Act, despite the fact that EPA has not approved the Agreement, because the purpose of the Agreement is to bring the state into compliance with the Act. In other words, plaintiffs argue that the compliance schedule is "in effect under this chapter" because the state was required by federal law to impose that schedule in an effort to meet the NAAQS.

Plaintiffs' argument has a great deal of intuitive appeal.[8] However, no federal court appears to have accepted it. This court, for the reasons stated below, declines to be the first to do so.

Plaintiffs cite dictum by Judge Easterbrook in *Village of Oconomowoc Lake v. Dayton Hudson Corp.,* 24 F.3d 962, 964 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994), for the proposition that the language "in effect under" the Act should be read broadly. In that case, a village sought to prevent a company from building a warehouse in the vicinity of the village because it feared that the movements of trucks to and from the warehouse would increase air and water pollution in the area. The village employed the Clean Air Act as a weapon in preventing construction of the warehouse. Specifically, the Village argued that the proposed warehouse was a "major new source" of air pollution and as such, needed a federal permit to operate. The village sued the company under § 7604(a)(3) which permits citizen suits to prevent construction of "major new sources" that do not have proper permits. The Village did not sue under § 7604(a)(1), as have plaintiffs in this case, because it wished to avoid the notice requirements established for suits brought under that subsection. *See* 42 U.S.C. § 7604(b).

The Court held that the warehouse was not a "major new source" and that, accordingly, a cause of action could not be stated under § 7604(a)(3). However, in dictum, Judge Easterbrook stated that:

If [§ 7604(a)(1)] had been the foundation of the suit, and if we were to assume that the emissions from trucks going to and from the warehouse violate Wisconsin's implementation plan—for the state has elected to regulate such indirect emissions despite the lack of federal compulsion to do so—then it would have been necessary to decide whether a provision of a state plan going beyond the federal minima is "an emission standard or limitation under this chapter." States must clear their imple-

---

8. Indeed, it also appears to comport with the understanding of the citizen suit provision expressed by a leading supporter of the Act in Congress. *See* Legislative History at 280–281, 91st Cong., 2d Sess., *reprinted at* Appendix B, *Natural Resources Defense Council, Inc. v. Train,*

510 F.2d 692, 728 (D.C.Cir.1975) ("a citizen suit can be brought only to enforce the provisions of the act *or the requirements that are established as a result of the operation of the act*) (Statement of Senator Muskie) (emphasis supplied).

mentation plans with the EPA and enforce them faithfully; it is accordingly possible to characterize a state's rules as "an emission standard or limitation under this chapter" in the sense that it is *adopted* under the chapter and includes rules that *satisfy* the chapter. (Emphasis in original).

*Village of Oconomowoc Lake,* 24 F.3d at 964.

Thus, Judge Easterbrook hypothesized that requirements included in a state SIP that go beyond what is required of the State by the Act, might nonetheless be characterized as requirements that are "in effect under" the Act. Accordingly, citizen suits might be brought to enforce the stringent state requirements even though those requirements are not mandated by the Act. Plaintiffs suggest that Judge Easterbrook's proposed reading of the language "in effect under" the Act is broad. Plaintiffs urge the court to adopt a similarly broad reading of the language.

Judge Easterbrook's dictum, however, may not be as broad as plaintiffs suggest. After all, the state requirement that the Village could arguably have sued to enforce under § 7604(a)(1) was included in the state's SIP. And as a general proposition, provisions in a state SIP are federally enforceable under § 7604. Thus, although Judge Easterbrook's hypothetical reading of § 7604 may be some degree broader than standard readings of the contours of § 7604, it is not clear that it is. More important, however, is the fact that the Agreement at issue here is not included in Virginia's SIP. Thus, even if this court were inclined to accept Judge Easterbrook's dictum, the court would need to extend the reasoning of the dictum further to hold that the Agreement is "in effect under" the Act. The court is not prepared to do so.

The court notes that *Conservation Law Foundation v. Federal Highway Administration,* 24 F.3d 1465 (1st Cir.1994), appears marginally to extend the meaning of "in effect under" the Act. In that case, plaintiffs sued to enjoin construction of a highway. They alleged that the construction would violate §§ 7506(c)(1) and (c)(3) of the Act which collectively prohibit the federal government from financing projects that lead to violations of a state's SIP. Plaintiffs argued that § 7506 establishes a "standard of performance" which is an enforceable "emission standard or limitation" under § 7604(f)(1). Thus, plaintiffs maintained that construction of the highway, by violating § 7506, would also constitute a violation of an "emission standard or limitation." Accordingly, plaintiffs argued they could bring a citizen suit to enjoin the construction. The defendant argued for dismissal, claiming that

> the language of the citizen suit provision of the Clean Air Act, which authorizes suits to enforce violations of an "emission standard or limitation," limits such suits to cases involving standards and limitations set out in a state implementation plan or standards set by EPA. Because the present suit does not involve the enforcement of standards set out in a state or EPA plan . . . the district court had no jurisdiction to consider the plaintiffs' claims in the first place.

*Conservation Law Foundation,* 24 F.3d at 1477.

The First Circuit rejected the defendant's argument. It held that as long as a "standard of performance" was set out in the Act itself, that "standard of performance" was enforceable under the citizen suit provision even if the standard was not included in an EPA or state plan. The court acknowledged that "there are a number of cases holding that the citizen suit provision only applies to suits against individual polluters or government actors that fail to comply with the specific requirements of a state or EPA implementation plan. . . ." *Id.* at 1477 (citations omitted). The court continued:

> We do not believe, however, that any of these cases have satisfactorily explained why the plain language of § 7604(f)(1) would not apply to suits like the one before us in this case. Instead, these cases seem primarily concerned with declining to allow plaintiffs to use § 7604 as a vehicle to force government agencies or instrumentalities to comply with their general obligations under the Clean Air Act. Thus, these cases restrict the use of § 7604 to violations of objective evidentiary standards and avoid suits requiring reanalysis of

technological or other considerations at the enforcement stage.

The present case is distinguishable in that plaintiffs substantive claims involve statutory provisions [i.e. §§ 7506(c)(1) and (c)(3) ] that are fairly specific and objective. The provision is more similar to a specific emission control standard applicable to a specific source, than a general air quality standard which may be accomplished in any number of ways depending on the "technological considerations" of the state or agency developing the implementation plan designed to reach the proscribed [sic] level of quality.

*Id.* at 1478 (internal citations omitted).

Thus, the court held that a "standard of performance" set out in the Act need not be included in an EPA or state plan to be "in effect under" the Act. However, the court relied heavily on the fact that the plaintiffs were suing to enforce §§ 7506(c)(1) and (c)(3) of the Act which establish specific pollution reduction requirements, thereby distinguishing it from cases seeking to enforce general air quality standards.

In short, *Conservation Law Foundation* lends some support for the proposition that an "emission standard or limitation," like the schedule of compliance established by the Agreement, need not be set out exclusively in a SIP or an EPA plan to "be in effect under" the Act. However, the case does not squarely help plaintiffs here. Plaintiffs in *Conservation Law Foundation* sought to force compliance with an "emission standard or limitation" (i.e. a "standard of performance" under § 7506) that was explicitly created by the Act. The "emission standard or limitation" at issue here (i.e the schedule of compliance) was created by the Agreement which is itself one step removed from the Act.

Plaintiffs respond that the emission standard or limitation here was necessarily "created" by the SIP provision of the Act, 42 U.S.C. § 7410. After all, the Agreement

states that the SIP will most likely be revised to include the plan submitted by TGPL pursuant to the Agreement.[9] And, of course, the SIP provision is enforceable. However, this argument is strained. The SIP provision is of a much more general nature than are the specific requirements created by § 7506. Indeed, § 7410, unlike § 7506, does not "create" specific "emission standards or limitations" as defined by § 7604(f). Thus, for the court to accept plaintiffs' broad reading of the meaning of "in effect under" the Act, it would have to extend the logic of *Conservation Law Foundation* a significant step. Again, the court declines to do so.

In summary, the court holds that the Agreement satisfies the threshold definition of an emission standard or limitation in that it creates a "schedule of compliance." However, the court also concludes that the emission standard or limitation created by the Agreement is not "in effect under" the Act. Accordingly, the court holds that the Agreement is not enforceable under § 7604 and that dismissal of Count One is appropriate.

**B.**

Count Two alleges that the Unionville facility "has caused and continually causes violations of the [NAAQS] for NO₂ in the Unionville area." *Complaint* ¶ 24. Moreover, the count alleges that "the Unionville facility is itself in violation of the NAAQS for NO₂ and not just a cause or contributor to such a violation." *Complaint* ¶ 25. Thus, Count Two appears to seek direct enforcement of the NAAQS against TGPL.

Plaintiffs acknowledge that current case law interprets the citizen suit provision as precluding suits to enforce the NAAQS directly. Rather, the NAAQS may only be enforced indirectly, generally through suits for violations of a SIP or of an EPA plan. In the language of the statute, a NAAQS is not an "emission standard or limitation" as defined at § 7604(f)(1). *See Coalition Against*

---

9. The Agreement at page 6, point heading 5 states:

> The agreement called for in paragraph 4 of this Section will most likely result in a source specific change to the State Implementation Plan (SIP); as such it will be subject to a public comment period, with a public hearing. Once the public comment period and public hearing have been completed, a source specific SIP revision shall be submitted to the U.S. Environmental Protection Agency for its comments and approval.

*Columbus Ctr. v. New York*, 967 F.2d 764, 769 (2d Cir.1992) ("A cornerstone of this Court's interpretation of the citizen suit provision is the principle that an air quality standard established under the Clean Air Act is not an 'emission standard or limitation'"); *Accord Atlantic Terminal Urban Renewal Area Coalition v. New York City Dept. of Envtl. Protection*, 697 F.Supp. 157, 161 (S.D.N.Y.1988); *Citizens for a Better Environment v. Deukmejian*, 731 F.Supp. 1448 (N.D.Cal.1990), *modified*, 746 F.Supp. 976 (N.D.Cal.1990); *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164, 1173 (9th Cir.1979), *cert. denied*, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979).

Plaintiffs, however, argue that the cases holding that the NAAQS are not an "emission standard or limitation" predate the 1990 amendments to the Clean Air Act, and, specifically, the adoption of § 7604(f)(4). Subsection 4 expands the definition of "emission standard or limitation under this chapter" to include

> any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations which is in effect under this chapter or under an applicable implementation plan.

42 U.S.C. § 7604(f)(4).

Plaintiffs argue that this amendment, specifically the "any other standard" language, contemplates citizen suits for violations of the NAAQS.

The court rejects this contention. First, *Coalition Against Columbus Center v. New York*, 967 F.2d 764, 769 (2d Cir.1992), a case decided after the 1990 Amendments became effective, reiterates that the NAAQS are not an "emission standard or limitation." Second, the EPA has reiterated that the NAAQS are not directly enforceable against a source. The preamble to the EPA Regulations for the Title V permit program, a program enacted under the 1990 Amendments, states that "NAAQS implementation is a requirement imposed on the states in the SIP; it is not directly imposed on a source." 57 Fed.Reg. 32276 col. 1 (July 21, 1992). Third, policy concerns militate against the enforcement of NAAQS directly against a source. A SIP may allow a specific source to exceed the NAAQS if it is too expensive for that source to comply with the NAAQS. However, the SIP might then compensate for that excess by requiring a source down the road to cut its emissions below the NAAQS if the second source can reduce emissions more cheaply. Taken as a whole, the SIP achieves the NAAQS, despite the fact that one of the sources is emitting at levels exceeding the NAAQS. Thus, the contention that "the Unionville facility is itself in violation of the NAAQS for $NO_2$, and not just a cause or contributor to such a violation," *complaint* ¶ 25, appears misguided.

At bottom,

> Plaintiffs' construction of the [Act] would eliminate the distinction between the NAAQS and measures that are designed to assure attainment of the NAAQS. The [Act] and the regulations promulgated thereunder, however, emphasize the distinction between the attainment of the NAAQS, which is a goal of the [Act], and the specific provisions of an SIP which are the only permissible subjects of a citizen suit.

*Wilder v. Thomas*, 854 F.2d 605, 609, 614–615 (2d Cir.1988).

Accordingly, dismissal of Count Two is appropriate.

### C.

Count Three alleges that the TGPL has repeatedly and continually violated both the state odor rule [10] and the 1991 Agreement with respect to the rule. Plaintiffs argue that violations of the odor rule are federally enforceable because the odor rule is an "emission standard or limitation," 42 U.S.C. § 7604(a)(1), that is included in Virginia's SIP, 42 U.S.C. § 7604(f), and that even if it is not included in Virginia's SIP, it is still feder-

10. *See* note 2, *supra.*

ally enforceable because it is "in effect under" the Act, *id.*

TGPL, in response, argues that the alleged violation of the odor rule is not federally enforceable because it is not included in the state SIP.

For purposes of analysis, the court assumes that the odor rule satisfies the threshold definition of an "emission standard or limitation" under § 7604(a)(1). The issue then, again, is whether that "emission standard or limitation" is "in effect under this chapter ... or under an applicable implementation plan." 42 U.S.C. § 7604(f). The court concludes that it is not.

1.

■ The parties dispute whether the odor rule is included in Virginia's SIP. If it is, then the plaintiff's claim under Count Three is likely enforceable because the plaintiffs would be suing to enforce an "emission standard or limitation" that is "in effect under an applicable implementation plan." 42 U.S.C. § 7604(f). The court concludes, however, that the odor rule is not included in Virginia's SIP.[11]

Plaintiffs argue that the odor rule is incorporated into the Virginia SIP. They maintain that in 1974, Virginia submitted two rules to EPA "for informational purposes only": the odor rule and an open-burning rule. 39 Fed.Reg. 41254 col. 2 ¶ 4 (Nov. 26, 1974). Plaintiffs point out, however, that the final regulation approving Virginia's submissions explicitly excludes only the open-burning rule from the SIP. The regulation provides as follows:

With the exceptions set forth in this subpart, the Administrator approves Virginia's plan for the attainment and maintenance of the national standards. The State included a provision dealing with open burning in its submittal of August 10, 1973. This provision was included for informational purposes only and was not considered to be a part of the plan to implement national standards. Accordingly, this additional

provision is not considered a part of the applicable plan.

*Id.* § 52.2423(a).

Plaintiffs extrapolate from the fact that the regulation explicitly excludes the open-burning rule, yet makes no mention of the odor rule, that EPA approved the odor rule as part of Virginia's SIP. Plaintiffs make this assertion despite the fact that Virginia submitted the odor rule, like the open-burning rule, "for information purposes only."

Plaintiffs cite *Concerned Citizens of Bridesburg v. United States Environmental Protection Agency,* 836 F.2d 777 (3d Cir. 1987) and *Save Our Health Organization v. Recomp of Minnesota,* 829 F.Supp. 288 (D.Minn.1993), *aff'd* 37 F.3d 1334 (8th Cir. 1994) for support in arguing that the odor rule is federally enforceable. In *Bridesburg,* plaintiffs challenged the EPA's recision of odor regulations contained in Pennsylvania's SIP. The EPA argued that it could rescind the odor regulations because the regulations had no connection to the achievement of any ambient standard. Thus, EPA argued, it had no statutory authority to approve odor regulations included in a SIP. The Third Circuit held that the odor rule was a part of Pennsylvania's SIP and that as such, EPA had to go through the administrative procedure outlined under the Act in order to modify Pennsylvania's SIP. Since EPA had not done so, the odor rule was still an enforceable element of Pennsylvania's SIP.

Similarly, in *Save Our Health,* the defendant argued that the court lacked jurisdiction over plaintiffs' claim because the odor rule, although included in Minnesota's SIP, was not federally enforceable in a citizen suit. The defendant argued that EPA exceeded its authority in approving odor regulations and that, consequently, the odor regulations had no force. The court rejected this argument on the strength of *Bridesburg.*

This court is not persuaded by the cited authority that the Virginia odor rule is federally enforceable in a citizen suit. The common element in *Bridesburg* and *Save Our*

---

11. Plaintiffs contend that the question of whether the odor rule is included in Virginia's SIP is a question of fact that necessarily survives a mo-

tion to dismiss. However, the issue is properly characterized as a question of law.

*Health* is missing in this case: the state odor rules in both *Bridesburg* and *Save Our Health* were clearly incorporated into the respective state SIPs. *See Save Our Health,* 829 F.Supp. at 291 ("There is no dispute that the EPA adopted Minnesota's SIP, including the odor regulations, and that those regulations remain in the SIP"); *Bridesburg,* 836 F.2d at 781 ("Pennsylvania's Department of Environmental resources submitted most of the odor regulations at issue in this case as part of its original SIP proposal to the EPA ..."); *id.* at 780 ("The EPA not only approved the SIP odor provisions at issue here, but twice approved modifications to them without suggesting that odor regulations as a whole are unauthorized").

Thus, the issue in both *Bridesburg and Save Our Health* was whether odor regulations explicitly contained in a SIP were federally enforceable given EPA's position that odor regulations are not a required element of a SIP. The issue here, in contrast, is whether the odor rule is part of Virginia's SIP in the first instance. The court concludes that it is not.

The court relies on the self-evident proposition that the state of Virginia did not intend for its odor regulations to be included in its SIP. No other inference can be drawn from Virginia's submission of the odor rule to EPA "for informational purposes only." Moreover, it is apparent that the EPA does not consider state odor rules to be legitimately included in any SIP since those rules in no way help to accomplish the goals of the Act. Indeed, EPA's position on this issue has been a matter of public record in Virginia for twenty years. *See* 39 Fed.Reg. 19958 col. 1 (June 5, 1974) (noting that the Virginia odor rule "was submitted only for the information of the Environmental Protection Agency and the public since odor regulations are not designed for the attainment or maintenance of any national ambient air quality standard").

In short, this court will not read the Virginia odor rule into the Virginia SIP where the

record suggests that both the state of Virginia and the EPA do not consider it a part of that document. Thus, the court concludes that the odor rule is not in effect "under an applicable implementation plan," 42 U.S.C. § 7604(f). Accordingly, unless the odor rule is nonetheless "in effect under" the Act, *id.,* it is unenforceable in a citizen suit.

## 2.

██ The court concludes that the odor rule is not otherwise "in effect under" the Clean Air Act. Although the court is sympathetic to the argument that this language might support a broader reading than (1) explicit EPA approval or (2) inclusion in a SIP, *see* discussion at III. A, *supra,* the language cannot support plaintiffs' argument in this context. As EPA has stated, "odor regulations are not designed for the attainment or maintenance of any national ambient air quality standard," 39 Fed.Reg. 19958 col. 1 (June 5, 1974). Given that the Virginia odor rule is irrelevant to achieving the overarching goal of the Clean Air Act, the court rejects the assertion that it is "in effect under" the Act. Thus, the odor rule is unenforceable under § 7604 and dismissal of Count Three is appropriate.

## D.

Count Four alleges a state law nuisance claim. TGPL makes two arguments in defense. First it argues that the five-year statute of limitations for nuisance has run. Second, TGPL argues that even if the statute of limitations has not run, the claim is barred because plaintiffs have failed to plead individual damages in excess of $50,000. Thus, TGPL argues, the court cannot exercise diversity jurisdiction over the fourth claim.[12] The court rejects TGPL's statute of limitations argument. However, the court holds that plaintiffs have failed adequately to allege the existence of diversity jurisdiction.

## 1.

██ The statute of limitations applicable to Count Four is five years. *Va.Code* § 8.01–

---

12. Given the court's dismissal of the three federal claims, the court declines to exercise supplemental jurisdiction over the state law claim alleged under Count Four. 28 U.S.C. § 1367(c)(3).

Thus, the existence of diversity jurisdiction over the state law claim is crucial for the maintenance of the suit.

243(B). The parties dispute when the cause of action stated under Count Four accrued. TGPL argues that given the permanent nature of the structure creating the nuisance, the cause of action accrued at the time the facility came on line in its current form. *See G.L. Webster Co. v. Steelman,* 172 Va. 342, 1 S.E.2d 305, 314 (1939). Since the current equipment at the Unionville facility was installed in 1971, TGPL argues that the statute of limitations expired in 1976.

Plaintiffs respond that the nuisance derives not from the buildings or structures that comprise the facility, but rather from the manner of the facility's operation. In such a context, plaintiffs maintain, where a nuisance is not permanent, but subject to abatement, plaintiffs may recover injuries for five years back in time, and, indeed, may bring successive suits, each for a five year period. *See Norfolk & W.R. Co. v. Allen,* 118 Va. 428, 87 S.E. 558 (1916).

The court concludes that the claim alleged under Count Four is not time-barred. The Supreme Court of Virginia has stated that "the general rule ... in an action for a nuisance, [is that] repeated actions may be brought as long as the nuisance continues." *Virginia Hot Springs Co. v. McCray,* 106 Va. 461, 56 S.E. 216 (1907). However, there is an exception to that rule for damages arising from "permanent nuisances." If damages are caused by a "permanent nuisance," an action to recover those damages must be brought within five years of the genesis of the nuisance. *Id.* Of course, the question arises as to whether a given nuisance is a "permanent" one. The Supreme Court of Virginia has commented as follows:

> The confusion which is found in the precedents has arisen not so much from the statement of governing principles as from the inherent difficulty in clearly distinguishing injuries which are original and permanent from those which are continuing and in assigning each particular case to its appropriate class.... Possibly as good an illustration of the distinction as can be suggested is in the case of the construction of a milldam across the course of a stream. So far as the dam operates to permanently overflow the land of another and take away

from the owner all beneficial use of his property, the damage may be treated as original and all recovered in one action; but so far as it may cause only a periodical or occasional flooding, the damage is continuing, and successive recoveries can be had.

*Norfolk & W. Ry Co. v. Allen,* 118 Va. 428, 87 S.E. 558, 560 (1916) (quoting *Harvey v. Mason City & Fort Dodge R.R.. Co.,* 129 Iowa 465, 105 N.W. 958 (1906)).

The court is of the opinion that the damages claimed by plaintiffs in this case are of the continuing kind. The complaint alleges that the Unionville facility, "on a[n] intermittent and unscheduled basis, emits extremely loud noises up to 80 decibels." *Complaint* ¶ 31. This allegation strikes the court as exhibiting characteristics of a periodic nuisance and not of a permanent one. Rather than "flooding" plaintiffs once and for all time with loud noises, the facility peppers plaintiffs with the nuisance. The complaint also alleges that the general operation of the facility "generates disturbing noises and vibrations and shakes and rattles windows and glass within plaintiffs' houses on a regular basis." *Id.* ¶ 32. Again, the court doubts that the houses are in a constant state of vibration. Rather, it is a periodic, albeit frequent, state of vibration that plaintiffs must endure. Finally, the complaint alleges that the emissions from the facility create health hazards, cause physical discomfort, and aggravate health conditions, *id.* ¶ 30, and that the odors emanating from the facility are unreasonable, *id.* ¶ 29. The court concludes that such effects are not of a permanent nature. Rather, the existence of such nuisances will tend to fluctuate with prevailing winds, weather patterns, and industrial activity. It would appear that all of the alleged nuisances caused by the operation of the facility may well be candidates for substantial abatement.

Thus, the court concludes that the nuisances alleged under Count Four are not of a permanent nature. Rather, they occur intermittently, although with such frequency that they appear to the plaintiffs to be continuous. On this reasoning, the statute of limitations on the nuisance claim has not yet run with

respect to injuries caused plaintiffs over the past five years.

2.

 Count Four alleges that plaintiffs "have suffered compensatory damages in excess of $50,000." *Complaint* ¶ 35. TGPL maintains that this allegation is inadequate to support diversity jurisdiction because each plaintiff does not separately allege damages in excess of $50,000. *See Feikema v. Texaco,* 16 F.3d 1408, 1412 (4th Cir.1994). Plaintiffs contend that the pleading does support the exercise of diversity jurisdiction by the court. They note that the pleading in *Feikema* alleged a joint value for damages that is absent from the current pleading. In the alternative, plaintiffs request an opportunity to amend their complaint to allege adequately diversity jurisdiction. *See Feikema,* 16 F.3d 1408.

The court concludes that Count Four does not allege adequately the existence of diversity jurisdiction. "It is fundamental that each plaintiff must demonstrate the jurisdictional basis and allege the necessary amount in controversy." *Feikema v. Texaco,* 16 F.3d 1408, 1412 (4th Cir.1994). As did the plaintiffs in *Feikema,* plaintiffs here "only alleged the jurisdictional amount in the aggregate, without attributing damages of over $50,000 to each plaintiff as required by law." *Id.* "Nevertheless, because the defect is in form only and amendments to complaints are to be freely allowed," *id.,* the court grants plaintiffs leave to amend their complaint to correct the jurisdictional defect, if they may properly do so.

IV.

For the foregoing reasons, the court grants defendant's motion to dismiss as to Counts One, Two and Three of the complaint. However, the court denies the motion with respect to Count Four and further grants plaintiffs leave to amend that Count so as to correct its jurisdictional defect to the extent that plaintiffs may properly do so. An appropriate Order shall this day issue.

*ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED

as follows:

1. Defendant's motion to dismiss the complaint in the above-captioned case pursuant to Fed.R.Civ.P. 12(b)(1) and (6) shall be, and it hereby is, granted with respect to Counts One, Two, and Three;

2. Defendant's motion to dismiss shall be, and it hereby is, denied with respect to Count Four;

3. Plaintiffs' shall have, and they hereby do have, leave to amend the complaint so as to correct the jurisdictional defect, if they may properly do so, with respect to Count Four.